## Beltz v. Garrison, et al.

*Corporations—Contracts—Contracts of directors—Binding effect on corporation not a party to the contract.*

Where persons about to become directors and sole stockholders of a corporation agreed with a creditor who had expended money upon the corporate property that out of the net earnings of the corporation a proportion thereof was to be applied to the payment of the debt, the corporation though not a party, was bound by the agreement, and in a suit in equity by the creditor to compel the corporation to pay the amount called for by the contract, the lower court properly entered a decree for the plaintiff.

Argued Oct. 27, 1915.   Appeal, No. 243, Oct. T., 1915, by Great Western Lead Manufacturing Company, from decree of C. P. Allegheny Co., Jan. T., 1915, No. 1146, for plaintiff, on bill in equity for an accounting, in case of John Beltz v. Samuel Garrison, H. L. Williams, J. E. McGinness, F. E. McGillick, George H. Fritch, Wm. I.

N. Lofland and Great Western Lead Manufacturing Company. Before BROWN, C. J., MESTREZAT, POTTER, MOSCHZISKER and FRAZER, JJ. Affirmed.

Bill in equity for an accounting.

MACFARLANE, J., filed the following findings of fact, conclusions of law and opinion:

First: On and before April 10, 1912, the Great Western Lead Manufacturing Company, a corporation under the laws of the State of Delaware, with its business office in the City of Pittsburgh, Pennsylvania, was the owner of a leasehold in the State of Illinois. It had a number of borings on the property, had begun and abandoned a shaft, and at this time had begun another. More than $36,000 had been expended. Zinc ore had been found on the property, but the shaft had not yet reached a sufficient depth to operate and to show the amount and value of the ore. The company was without funds. All of the stock had been assigned to, or was in the control of, John Beltz, the plaintiff. F. E. McGillick had an agreement with Beltz to share with him, but McGillick's interest was not known to any of the other parties in this case.

Second: On April 10, 1912, a contract in writing was entered into between John Beltz, F. E. McGillick, George H. Fritch, and Samuel Garrison, a copy of which is attached to plaintiff's bill as exhibit B and made a part of this finding. It recites that Beltz was the owner of all of the capital stock of the Great Western Lead Manufacturing Company, the ownership of the lease of partially developed ore lands in Illinois, and the agreement of the parties to develop them and if ore is found in paying quantities to operate the same upon the terms and conditions thereinafter set forth. The agreement was: First, that Beltz will deliver to the treasurer of the corporation all of the capital stock; second, that of the capital stock 2,000 shares shall remain in the treasury and be known as treasury stock, to be hereafter sold

when and as ordered by the board of directors; third, three shares of the stock to be issued to each of the parties and three shares each to two other persons, as required by the laws of Delaware, these shares to be surrendered on the request of the four parties; fourth, when the development work is finished, if ore is found in sufficient quantity and quality to justify the erection of a mill, the remaining stock to be issued in equal quantities to the four parties; fifth, each of the parties to pay to the treasurer of the corporation $250, and a like sum, if necessary, to further the development work and pay incidental expenses, said payment to be made within thirty days after notice, and failure to make said payment to be deemed a surrender and cancellation of all rights of the defaulting party.

Further, if ore was found in paying quantities a mill should be erected and if sufficient stock had not been sold, or could not then be marketed to pay the cost of construction, an assessment may be levied on the stock issued and that none of the parties should sell or pledge his stock or any part thereof until he had offered it to the other parties.

The net profits derived from the operations to be distributed: first, to the repayment to the parties of the sums "severally advanced by them herein provided"; second, after said sums had been repaid, fifty per cent. of the net profits shall then be applied to the repayment of the $36,000 "which the said Beltz has already expended upon the leased premises," and fifty per cent. as dividends upon the stock of the corporation until Beltz had been paid in full.

Third: On the same day, April 10, 1912, a meeting of the directors of the corporation was held, three of the directors resigned and McGillick, Fritch and Garrison were elected, they with Beltz and M. J. Dain, a nominal stockholder, constituting the board. Garrison was elected president, and Fritch treasurer. Each of the four parties paid $250 to the treasurer.

Fourth: From time to time thereafter Beltz assigned and delivered to the treasurer of the corporation all of the stock called for by the contract. The three shares of stock were not issued to the four parties until after a meeting held on April 23, 1913.

Some time after April, 1912, Garrison paid to the treasurer $325, Fritch $325, McGillick $200, and Beltz $200.

Fifth: In November or December of 1912 Garrison and Fritch told Beltz and McGillick that they would go no further and would have nothing more to do with the project. But on January 2, 1913, they executed an amendment to the contract, Exhibit B, that they would return to the treasurer of the corporation out of the 2,000 shares of the stock allotted to each of them, 1,200 shares to be sold so as to bring the treasury stock to the amount of $6,000 and agreed that they would pay in addition to the $650 already paid in by them the sum of $350. This agreement was not performed and was abandoned.

It was then agreed to organize a new company, and, if possible, to get others to buy stock, the four parties to take the same amount as the others and to receive credit for what they had already contributed. On January 18, 1913, J. E. McGinness gave Garrison $650 to be put into the project, Garrison agreeing that he would see that McGinness was protected, and stock was later issued to him.

Sixth: In March, 1913, the four parties consulted James Balph, Esquire, an attorney-at-law, and, acting under his advice, the capital of the corporation was reduced to $10,000. The fact was discovered by Mr. Balph that the charter had been forfeited on January 19, 1912, by the State of Delaware for the nonpayment of taxes. The taxes were then paid and the charter reinstated on April 16, 1913. The nonpayment of the taxes was known to Beltz and McGillick, but not to the others.

Seventh: April 23, 1913, at a meeting of the stockholders the capital stock was reduced from $500,000 to

$10,000, the entire stock being voted. The three shares called for by the contract were transferred to McGillick, Garrison and Fritch, the certificates being antedated April 12, 1912. Each of the parties subscribed for $1,000 of the $10,000 of capital stock and H. L. Williams and J. E. McGinness also subscribed the same, it being agreed that McGillick, Beltz, Garrison and Fritch receive credit for the money already contributed by them. They had all paid their subscriptions except Beltz, who paid nothing in addition to the $475 already paid under the contract, Exhibit B, but he was carried on the books as having subscribed for 20 shares. On April 26, 1913, McGinness and Williams were elected to the board of directors of the company.

Eighth: On May 24, 1913, for the purpose of raising additional capital for the operations of the company, the directors authorized the sale of the shares remaining unsold, and McGillick and Beltz declining to purchase, all was subscribed and paid for at par by Garrison, Fritch, Williams and McGinness. On September 26, 1913, for the same purpose, the capital stock was increased from $10,000 to $25,000. It was directed that $5,000 of the stock should be sold, and it was taken and paid for by the stockholders except Beltz, and his share was, with his consent, taken by McGillick. On November 26, 1913, the sale of the remaining stock was authorized, or so much as might be necessary for the company's business, Beltz and McGillick refusing to purchase, Williams, Garrison, McGinness and Fritch took and paid for the same. Beltz and McGillick were present and voted at all of the meetings and Beltz was a member of the board of directors until November 28, 1914. McGillick is still a director.

Ninth: At none of these meetings was any action taken by the directors or stockholders on the contract, Exhibit B, and its existence was not known to Williams or McGinnis, until the meeting of the directors on November 28, 1913, when Beltz and McGillick called at-

tention to the contract and protested against action
authorizing the sale of stock, and the following was en-
tered upon the minutes: "Mr. Beltz raised the question
of some contract existing between Messrs. Garrison,
Fritch, McGillick and himself, and he therefore pro-
tested against any action authorizing any sale of stock.
Mr. McGillick offered the same protest."

Tenth: McGillick's interest in the contract was known
to Garrison and Fritch in November or December, 1912.

Eleventh: $23,525 stock has been sold and that sum,
together with some of the earnings of the company, has
been expended upon the property. At the time of filing
the bill and the trial, the holders of the stock were the
persons already named, and, in addition, Samuel Garri-
son, trustee, Annie M. Garrison, and J. B. Laubach.
The property has been developed, the company has prac-
tically no debts, it has made profits and paid dividends
to the amount of $21,172.50 and has declared another
dividend not yet paid of $2,352.50, and when this is paid
the stockholders will have received the entire amount
paid by them for their stock. Beltz and McGillick have
received and retained the checks sent to them for their
dividends but have not yet deposited them for collection.

Twelfth: The defendants claim that prior to the em-
ployment of Mr. Balph, Beltz had agreed that the con-
tract, Exhibit B, should be abrogated and cancelled. We
find that this was not the fact.

Thirteenth: McGillick was, in fact, a party plaintiff
and at the trial it was conceded that in the disposition
of the case he should be treated as a plaintiff and not as
a defendant. At the trial the plaintiff abandoned the
portion of the bill relating to the distribution of stock
and later presented an amendment to that effect.

CONCLUSIONS OF LAW.

First: The holdings of stock is a matter of internal
administration over which we have no jurisdiction. The

plaintiff withdrew that part of his case and we have not considered or adjudicated it.

Second: The corporation is bound by the contract, Exhibit B.

Third: The subsequent modifications in the distribution and sale of stock is not an abandonment.

Fourth: The stockholders are entitled to receive the April dividend of ten per cent.

Fifth: The plaintiff is entitled to a decree that, after the payment of that dividend, fifty per cent. of the net profits are to be paid by the corporation to John Beltz for his and McGillick's account to be applied to the debt of $36,000 until the same is paid, if the net profits are sufficient. The corporation to pay the costs.

### OPINION.

We have no question that Mr. Garrison was stating what he thought to be the truth in his testimony that Beltz had agreed to cancel the contract, but the cross-examination, the testimony of Mr. Fritch, and all of the circumstances lead to the conclusion that he was mistaken. The subsequent letters referring to the contract, without repudiating it, the fact that it was turned over to Mr. Balph with the other papers, that nothing was said to Mr. McGillick whose interest was known, as well as other facts support our conclusion. The finding of the amount expended disposes of the claim of false representations. The concealment of McGillick's interest was not of a material fact and did not harm the defendants.

Beltz acted as superintendent of the company for many months after the agreement, and whether he paid $500 in full or not, there was no attempt to forfeit his rights and no notice given to him. It is too late to now claim a forfeiture.

The important question is whether the corporation is bound by the terms of the contract. At the moment

when it was signed the four individuals could not bind the corporation but, having settled the terms upon which the property was to be operated they immediately took their places in the corporation, through which the contract was to be performed, and being all of the directors (except one nominal director) and all of the stockholders, the contract was carried out so far as it could be done, that is, the corporation purchased Beltz's stock and the four individuals paid into the treasury the agreed price. It was one transaction. It was for the benefit of the corporation. It was without funds and had no assets, except the property, and could not raise any money. The stock which Beltz delivered was ultimately sold for $23,525. The fact that the capital was later decreased and then increased does not affect this conclusion. A corporation may purchase its own stock: Dock v. Schlichter Jute Cordage Co., 167 Pa. 370; Coleman v. Columbia Oil Co., 51 Pa. 74. If it can purchase, it may agree to pay and limit the source of payment to profits. This was to its own advantage. The promise to pay was not renewed after Garrison and Fritch became directors and did not appear upon the minutes, but the transfers of stock were upon the records of the company. The adoption of a contract may be inferred from acts done, although no resolution is passed: Bagaley v. Pittsburgh & Lake Superior Iron Co., 146 Pa. 478. The company received the benefits and cannot be relieved of the burden. The principle upon which a corporation is held liable for the acts of its promoters is, that it cannot receive benefits without assuming the burdens: Bell's Gap R. R. Co. v. Christy, 79 Pa. 54; Girard v. Case Bros. Cutlery Co., 225 Pa. 327. There is more reason for applying this to a contract by individuals about to become the directors and the holders of all of the stock of a corporation in existence than there is for applying it to a case of promoters.

The suspension of the corporation does not change the situation. It was a corporation de facto and when

the charter was reinstated it was as if there had been no default. All parties treated the matter in this way. Officers de facto may bind a corporation. Mahoney Mining Co. v. Anglo-Californian Bank, 104 U. S. 192. A corporation acts by its directors and, practically for the purpose of binding it, they are the corporation.

This view of the case eliminates any question as to the rights of innocent stockholders.

The lower court entered the following decree:

First: That in addition to the dividends paid prior to the filing of the bill, which aggregate eleven thousand, seven hundred sixty-two and 50-100 ($11,762.50) dollars, the Great Western Lead Manufacturing Company, defendant, may pay out of its net earnings as further dividends, the sum of twelve thousand, two hundred sixty-two and 50-100 ($12,262.50) dollars, making in all the sum of twenty-four thousand, twenty-five ($24,025) dollars.

Second: That after said aggregate sum has been paid in dividends as aforesaid, fifty per centum (50%) of its net profits shall be paid by the said defendant company to John Beltz for his account and for the account of F. E. McGillick, to be applied to the debt of $36,000 until the same is paid, if fifty per centum of the net profits are sufficient to pay the same.

Third: The cost of this proceeding to be paid by the Great Western Lead Manufacturing Company, defendant.

The Great Western Lead Manufacturing Company appealed.

*Errors assigned* were in dismissing exceptions to various findings of fact and law of the trial judge and the decree of the court.

*R. A. Balph,* with him *James Balph,* for appellant.

*Thomas Watson,* with him *S. S. Robertson,* for appellee.

PER CURIAM, May 23, 1916:

After due consideration of all the assignments of error filed by the appellant, and the argument of learned counsel in support of them, we have not been convinced that any of them ought to be sustained, and the decree is, therefore, affirmed at appellant's costs on the facts found and the legal conclusions reached by the learned trial judge.

Appeal dismissed.