BELTZ v. GREAT WESTERN LEAD MFG. CO. et al.

(District Court, D. Delaware. May 8, 1918.)

No. 339.

1. ACTION ☞53(3)—SPLITTING DEMANDS—SEPARABILITY OF CLAIMS.

Claim against individual defendants for recovery of $36,000 expended by complainant in developing mining property, and claim against corporation for stock and dividends, both claims being under single contract between parties for exploitation of mining property, *held* separable, in sense that, while they could both be enforced in one action, they could also be separately enforced; the action against corporation for stock and dividends being brought in federal court, as involving internal management of foreign corporation after state court had refused to pass on claim against company.

2. ACTION ☞53(1)—SPLITTING DEMANDS.

There is no inflexible rule in equity against the splitting of demands, which may be done under special circumstances to avoid injustice.

3. JUDGMENT ☞828(3)—RES JUDICATA—JUDGMENT OF STATE COURT.

Defendants, in suit in a federal court, are concluded by a decision, in complainant's prior suit in a state court to which they all were parties, as to a question there decided.

4. TRIAL ☞388(1)—FINDING BEYOND JURISDICTION OF COURT.

Where state court ruled in stockholder's suit against his company and individual stockholders, that ownership of stock in foreign corporation was matter of internal administration, over which it had no jurisdiction, its finding that complainant paid nothing on his stock subscription, in addition to amount already paid, was erroneous.

5. CORPORATIONS ☞189(12)—STOCKHOLDER AS SUPERINTENDENT—SALARY—EVIDENCE.

Evidence *held* to show that complainant stockholder was to receive from company, as superintendent, a salary of $125 a month, and was also to be credited for any outlay incurred by him in that capacity.

6. TRUSTS ☞103(1)—TRANSACTIONS BETWEEN STOCKHOLDERS.

Where corporate stockholders agreed for development of mining property of company and division of stock in certain proportions, complainant stockholder's portion of capital stock was impressed with trust in his favor, in accordance with contract, and was not liable, either at law or in equity, without his consent to be taken and sold to other persons, save by due process of law.

7. CORPORATIONS ☞189(12)—RIGHTS OF STOCKHOLDER—AGREEMENT—VIOLATION—SUFFICIENCY OF EVIDENCE.

Evidence *held* to show that complainant, stockholder in a lead and zinc mining company, was wronged and victimized by other stockholders, for whose acts the company was responsible, whom he benefited by taking them into the company under an agreement to divide the corporate stock, and who practically threw him out.

8. DEPOSITS IN COURT ☞11—DISPOSITION BY JUDGMENT.

In stockholder's suit against company and other stockholders, company having become bankrupt, and other stockholders having paid into court amount of money to abide its order, with view to satisfaction, in whole or in part, of any demand determined to exist in favor of complainant, it being shown that by wrongful acts of his fellow stockholders complainant suffered loss of more than amount, he is entitled to receive entire amount, after deduction of costs.

In Equity. Suit by John Beltz against the Great Western Lead Manufacturing Company and others. Decree in accordance with the opinion.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward G. Bradford, Jr., of Wilmington, Del., and Thomas Watson, of Pittsburgh, Pa., for complainant.

Daniel O. Hastings, of Wilmington, Del., and James Balph, of Pittsburgh, Pa., for defendants.

BRADFORD, District Judge. This suit was instituted by John Beltz against the Great Western Lead Manufacturing Company, a corporation of Delaware, hereinafter referred to as the company, to obtain, among other things, certain relief touching capital stock of the company claimed by him together with dividends declared thereon. In 1905 the complainant and some associates acquired a lease of a tract of land containing 104 acres in Jo Daviess County, Illinois, and began prospecting on it for lead and zinc ore. In October, 1908, the lead company was incorporated, with a capital of $500,000, divided into 10,000 shares of the par value of $50 each, and in November, 1908, by action of its board of directors and its stockholders the company purchased the above lease by issuing to the complainant and his associates its entire capital stock, full paid and non-assessable. Prior to April 10, 1912, the complainant acquired title to all the shares of the other stockholders, and $36,000 had been spent upon the leased tract, partly in the drilling of test wells to learn whether lead and zinc ore existed on the property, resulting in the discovery that such ore did exist there, but the limits of the ore deposit had not been definitely ascertained. The complainant had interested George H. Fritch and Samuel Garrison, two of the defendants, in the property, and an independent investigation had been made by or in behalf of those two defendants which disclosed the existence of a valuable deposit of ore. Finally, April 10, 1912, the complainant, F. E. McGillick, Fritch and Garrison, entered into an agreement, under seal, bearing that date, as follows:

"Memorandum of Agreement, made this 10th day of April, A. D. 1912, between John Beltz, F. E. McGillick, George H. Fritch and Samuel Garrison, all of the city of Pittsburgh, Pennsylvania.

"Whereas, said Beltz is the owner of all the capital stock of the Great Western Lead Manufacturing Company, a corporation organized under the laws of the State of Delaware, having its principal office in the town of Dover, in said state, which said corporation holds a lease on certain partially developed ore lands in Jo Daviess County in the State of Illinois—and whereas, the parties hereto have agreed to further develop said ore lands and, if ore is found in paying quantities, to operate the same, upon terms and conditions hereinafter set forth:

"Now this agreement witnesseth—First. That said Beltz shall and will deliver to the treasurer of the corporation all of the capital stock. Second. That of said capital stock, 2,000 shares shall remain in the treasury and be known as treasury stock, to be hereafter sold when and as ordered by the board of directors. Third. Three shares of stock shall be forthwith issued to each of the parties hereto, and three shares to M. J. Dain and J. McF. Carpenter, as required by the laws of Delaware—the shares issued to M. J. Dain and J. McF. Carpenter to be surrendered on request to the other parties hereto. Fourth. That when the development work has been completed, and if ore is found sufficient in quantity and quality to justify the erection of a mill, the remaining stock shall be issued in equal amounts to each of the parties hereto. Fifth. That upon signing this agreement each of the parties hereto shall pay to the treasurer of the corporation the sum of two hundred and fifty ($250.00) dollars, and a like sum, if necessary—to complete said develop-

ment work and pay incidental expenses, said payment to be made within 30 days after notice that said sum, or any less sum is necessary to complete said work; it being distinctly understood that failure to make said payment as herein provided be deemed and taken as a surrender and cancellation of all right, title and interest of said defaulting party arising out of this agreement.

"It is further agreed, that if ore is found in paying quantities a mill for the reduction of said ore shall be erected, and that if sufficient stock has not been sold or cannot then be marketed, to pay the cost of constructing said mill, an assessment may be levied upon the stock issued, none of the parties hereto shall sell or pledge his stock or any part thereof, until he shall have offered same to the other parties hereto at such price as the proposed purchaser has offered in good faith to pay.

"The net profits derived from the operations contemplated shall be applied and distributed as follows: First, to the repayment to said parties of the sums severally advanced by them herein provided. Second after said sums have been repaid fifty per cent. (50%) of the net profits shall then be applied to the repayment of the sum of thirty six thousand ($36,000.00) dollars, which the said Beltz has already expended upon the leased premises above mentioned, and fifty per cent. (50%) shall be applied as dividends upon the stock of the corporation, until said Beltz has been paid in full. It is also agreed, that the parties hereto shall pay, if required, the sum of six hundred ($600.00) dollars in settlement of present debts against said corporation—said Beltz agreeing to pay any additional amount necessary to fully pay said outstanding claims. Said Beltz also agrees to protect his associates against any demands or claims of persons heretofore associated or interested with him in said lease.

"Witness our hands and seals the day and year aforesaid.

|  |  |
| --- | --- |
| "John Beltz. | [Seal.] |
| "F. E. McGillick. | [Seal.] |
| "Geo. H. Fritch. | [Seal.] |
| "S. Garrison. | [Seal.] |

"Witness: John H. McCloskey."

The complainant claims that he performed all things necessary to be performed on his part and that all necessary conditions had been complied with to entitle him to the relief he seeks in this suit. He charges that the company has appropriated to itself and refuses to deliver to him one equal fifth part of its capital stock, which fifth part he contends was held for his benefit or in trust for him by it under the terms of the agreement of April 10, 1912; and prays that the company be compelled to deliver to him the said one-fifth part of capital stock under and in accordance with the provisions of that agreement, and also to account to him for any and all dividends which have become payable thereon.

It appears that the complainant in November, 1914, brought a suit in equity in the court of common pleas of Allegheny County, Pennsylvania, against Garrison, McGillick, Fritch and the company, and also H. L. Williams, J. E. McGinnis and William I. N. Lofland. In that suit the complainant, to use the language employed by the counsel for the defendant, sought to do two things, namely:

"(1) To compel the defendant corporation to pay to the complainant 50% of the net earnings of the company declared in dividends until he had received $36,000, as provided in the contract of April 10, 1912, known as Exhibit B.

"(2) To compel an accounting by the individual defendants with respect to stock and to compel them to deliver to complainant the stock they unjustly withheld from him."

A decree was made in September, 1915, in favor of the complainant so far as payment of the debt or sum of $36,000 out of net profits of the company was concerned, but the court made no decree touching his asserted right to an accounting for stock wrongfully withheld from him. The decree of the court of common pleas was affirmed by the supreme court of Pennsylvania May 23, 1916 (Beltz v. Garrison, 254 Pa. 145, 154, 98 Atl. 956, 958) which declared:

"After due consideration of all the assignments of error filed by the appellant, and the argument of learned counsel in support of them, we have not been convinced that any of them ought to be sustained, and the decree is, therefore, affirmed at appellant's costs on the facts found and the legal conclusions reached by the learned trial judge."

[1, 2] The defendants contend that the complainant is not entitled to any relief in this case for various reasons, one of them being that the cause of action under the contract of April 10, 1912, was single and entire and could not be divided, and that the affirmance on appeal of the decision of the lower court worked a final adjudication of the complainant's rights under that contract. Both the supreme court and court of common pleas recognized that the judicial tribunals there could not decide the question of the right asserted by the complainant to receive stock under the agreement of April 10, 1912, as involving the consideration of a matter of internal administration of the affairs of a foreign corporation "over which we have no jurisdiction." And for the same reason they could not go into the question whether the complainant had paid to the lead company an amount of money, or rendered to it services as superintendent, sufficient to entitle him to the receipt of stock. On this latter point the court of common pleas in its opinion on exceptions said:

"We made no finding relative to Beltz's right to stock, arising out of the agreement testified to by him that he was to receive a salary as superintendent so that we might not make any finding with reference to holdings of stock, which is a question of internal management."

It is insisted on behalf of the defendants that the proceedings in Pennsylvania preclude the granting to the complainant in this suit of relief touching any part of the subject-matter covered by the agreement of April 10, 1912. It is not asserted that the claim now made by him with respect to stock and dividends was passed upon by the Pennsylvania courts, by way either of allowance or disallowance. But it is contended that the two matters touching which relief was there prayed, namely, his right to recover the $36,000, and his right to receive stock and dividends, were practically, for the purposes of suit, one and indivisible, and that those courts, while establishing his right as to the $36,000, having failed to act upon his claim to stock and dividends, it is impossible to sustain in this suit any claim in that behalf. But neither the court of common pleas nor the supreme court of Pennsylvania regarded the two claims strictly as indivisible or inseparable; for, though both were disclosed in the pleadings, favorable action was taken upon one of them, while the other was simply ignored as involving a question of internal administration of a foreign corporation as to which there was lack of jurisdiction. On the part of the defendants attention is drawn to the fact that in the Pennsylvania suit the

claim for the recovery of stock was made against the individual defendants, and not against the company, while here the claim is against the latter; and it is suggested that, had such claim been made in Pennsylvania against the company rather than the individuals, the court having a clear right to pass upon the claim for $36,000 could and would have passed upon the claim to stock and dividends. This is a violent assumption, in view of the judicial holding that there was no jurisdictional authority to pass upon matters involving the internal administration of foreign corporations. But, further, it is beyond all reasonable question that the two claims, although arising from the same contract, were separable in the sense that while they could both be enforced in one action they could also be separately enforced in two. Stark v. Starr, 94 U. S. 477, 24 L. Ed. 276; The Haytian Republic, 154 U. S. 118, 125, 14 Sup. Ct. 992, 38 L. Ed. 930; Land v. Ferro-Concrete Const. Co. (D. C.) 221 Fed. 433, 439; Boyd v. Atlantic Coast Line R. Co. (D. C.) 218 Fed. 653, 658; Union Cent. Life Ins. Co. v. Drake, 214 Fed. 536, 547, 131 C. C. A. 82; Johnson v. Herold (C. C.) 161 Fed. 593, 598. The same evidence could not establish both claims. Evidence supporting the claim for the $36,000 could not support the claim for stock and dividends, and, conversely, evidence supporting the latter claim could not support the former. The proofs respectively required were essentially different. The complainant sought in the Pennsylvania suit to establish both claims. There was no omission or laches on his part in the matter. The objection came from the defendants who demurred to the whole bill on the ground that the suit involved an adjudication as to the internal management of a foreign corporation which could not be done. The demurrer was overruled, as the portion of the bill relating to the claim for the $36,000 was on its face unobjectionable. The complainant, however, in view of the objection taken by the defendants and the Pennsylvania doctrine of judicial abstention from passing upon the internal administration of foreign corporations, withdrew or abandoned that portion of the bill claiming stock and dividends, and adduced no evidence with respect to payments made or credits given to entitle him to capital stock claimed by him and dividends thereon. And the court of common pleas said with reference to this matter:

"The plaintiff withdrew that part of his case, and we have not considered or adjudicated it."

Consequently the complainant brought the present suit. Under these circumstances a decision by this court sitting in equity that the complainant is by reason of the proceedings in Pennsylvania barred or precluded from enforcing here whatever claim he has to stock of the company and dividends thereon under and by virtue of the agreement of April 10, 1912, would fall little short of a travesty upon the administration of justice. Further, there is no inflexible, cast iron rule in equity against the splitting of demands. It may be done under special circumstances to avoid injustice; and this case presents such circumstances.

The question is now presented whether the complainant did not become entitled under and by virtue of the agreement of April 10, 1912,

and action had thereunder, to receive from the company a portion of its capital stock together with dividends declared and payable thereon. The defendants claim that the agreement of April 10, 1912, was not binding upon the company for the reason that it never executed, adopted or ratified it. But in the Pennsylvania suit it was specifically found that the company was bound by that agreement. In the opinion of the court of common pleas it is stated:

"The important question is whether the corporation is bound by the terms of the contract. At the moment when it was signed the four individuals could not bind the corporation but, having settled the terms upon which the property was to be operated they immediately took their places in the corporation, through which the contract was to be performed, and being all of the directors (except one nominal director) and all of the stockholders, the contract was carried out so far as it could be done, that is, the corporation purchased Beltz's stock and the four individuals paid into the treasury the agreed price. It was one transaction. It was for the benefit of the corporation. It was without funds and had no assets, except the property, and could not raise any money. The stock which Beltz delivered was ultimately sold for $23,525. The fact that the capital was later decreased and then increased does not affect this conclusion. * * * The promise to pay was not renewed after Garrison and Fritch became directors and did not appear upon the minutes, but the transfers of stock were upon the records of the company. The adoption of a contract may be inferred from acts done, although no resolution is passed. Bagaley v. Iron Co., 146 Pa. 478 [23 Atl. 837]. The company received the benefits and cannot be relieved of the burden. The principle upon which a corporation is held liable for the acts of its promoters is, that it cannot receive benefits without assuming the burdens: Bell's Gap R. R. Co. v. Christy, 79 Pa. 54 [21 Am. Rep. 39]; Girard v. Case Co., 225 Pa. 327 [74 Atl. 201]. There is more reason for applying this to a contract by individuals about to become the directors and the holders of all of the stock of a corporation in existence than there is for applying it to a case of promoters."

[3] The bill in this case was originally brought only against the company, but, March 14, 1917, before final hearing, by leave of the court, Garrison, Williams, McGinness and Fritch intervened as co-defendants with the company, the four intervenors together with the company being parties defendant in the suit brought by the complainant in the Pennsylvania court of common pleas. The defendants in this suit are concluded by the decision in Pennsylvania on the question of the binding force of the contract upon the company.

The agreement of April 10, 1912, provides that:

"Said Beltz shall and will deliver to the Treasurer of the corporation all of the capital stock."

The defendants claim that he never owned and never delivered to the company all of the shares of its capital stock. The court of common pleas found as a fact that:

"Soon after April 23, 1913, Beltz assigned and delivered to the treasurer of the corporation for cancellation all of the stock called for by the contract."

The agreement did not limit the time within which the stock should be delivered. The court of common pleas in its opinion on exceptions said:

"Beltz was to deliver to the treasurer all of the stock, and he did so."

And in this case it has been admitted that Beltz had delivered to the company the entire amount of its capital stock,—10,000 shares. The fact that when Beltz delivered all of the stock to the treasurer of the company it was so delivered for cancellation is immaterial so far as the complainant's rights are concerned. It having been decided to reduce the capital stock of the company from $500,000 to $10,000 it was necessary that the stock which Beltz held subject to delivery should be cancelled in order that stock might be issued in accordance with the new arrangement. And unless such new arrangement was inconsistent with the rights of the stockholders it could not abrogate or terminate the agreement of April 10, 1912. It appears that the stock was reduced from the larger to the smaller sum in order to avoid the payment of an undue amount of tax, but not for the purpose of altering the proportionate interests of McGillick, Garrison, Fritch and Beltz in the capital stock of the company. The court of common pleas refused to find that:

"The agreement of April 10th, 1912, was abandoned and abrogated, and the agreement as to starting anew on the basis of a capital of $10,000 and getting in new men, and more money, was substituted."

The court in its opinion on exceptions said:

"Beltz was to deliver to the treasurer all of the stock, and he did so. 2,000 shares, or one-fifth, were to be treasury stock to be sold. The capital was reduced to $10,000, and there was sold to Williams and McGinness $2,000, or one-fifth. If ore is found sufficient to justify a mill, the remaining four-fifths of the stock were to be divided. If sufficient stock has not been sold to erect a mill, an assessment may be levied. An assessment, as such, was not made, but each of the four subscribed for $1,000 of stock. This was a substantial compliance with the plan outlined in the contract. The reduction in the capital was not a departure, as the proportionate interests remained the same. The contract made no provision for raising additional capital except by assessment. The sale of stock and the increase in capital found in the eighth finding, are not a departure from the spirit of the contract and do not indicate an abandonment. The agreement made, when the parties subscribed to $1,000 stock (seventh finding) that they were to receive credit for the amount paid in under Exhibit B is more consistent with its continued existence than with an abandonment."

The defendants further claim that the agreement of April 10, 1912, was abandoned January 2, 1913, and a new agreement entered into by the parties. In the answer it is alleged that on the latter date a new agreement essentially different from the original was entered into by Garrison, Fritch, McGillick and Beltz, consisting of the earlier agreement subject to a marginal modification, as follows:

"Pittsburgh, Jany. 2nd, 1913.

"We and each of us hereby agree that we will return to the treasury of the Great Western Lead Mfg. Co. out of the two thousand (2,000) shares of stock in said Co. allotted under this agreement to each of us the amount of twelve hundred (1,200) shares, to be sold so as to bring the treasury the sum of six thousand ($6,000) dollars. We also agree that each of us will pay in addition to the six hundred and fifty dollars already paid in by us the sum of three hundred and fifty ($350) dollars."

With respect to this marginal modification the court of common pleas in its findings of fact said:

"On January 2, 1913, they executed an amendment to the contract, Exhibit B, that they would return to the treasurer of the corporation out of the 2,000 shares of the stock allotted to each of them 1200 shares to be sold so as to bring the treasury stock to the amount of $6,000 and agreed that they would pay in addition to the $650 already paid in by them the sum of $350. This agreement was not performed and was abandoned."

In the answer it is alleged:

"A new agreement was entered into by said Garrison, Fritch, McGillick and Beltz, the complainant, sometime in February or the first part of March, 1913. by which it was provided that the agreement as made January 2, 1913, * * * was abrogated and rescinded."

The specific findings in the Pennsylvania suit that "the corporation is bound by the contract, Exhibit B," and that "the subsequent modifications in the distribution and sale of stock is not an abandonment" are a sufficient answer to the claim of abandonment, abrogation or rescission now made by the defendants.

[4, 5] The defendants contend that the complainant paid only $475 under the provisions of the agreement of April 10, 1912, and is entitled to no other or further credits upon his stock subscription. This position I deem untenable. It is true that in the Pennsylvania suit the court of common pleas found that the complainant "paid nothing in addition to the $475 already paid under the contract, Exhibit B." But this finding was made under circumstances which deprive it of any binding effect upon the complainant, and further, was clearly erroneous. As before stated, it was expressly ruled in that suit that the ownership of stock in a foreign corporation was "a matter of internal administration over which we have no jurisdiction," and entertaining that view the court of common pleas used the language already quoted, namely:

"We made no finding relative to Beltz's right to 'stock, arising out of the agreement, testified to by him, and that he was to receive a salary as superintendent, so that we might not make any finding with reference to holdings of stock, which is a question of internal management."

In the agreement of April 10, 1912, it was provided that upon signing it each of the parties thereto should pay to the treasurer of the company $250, and also a further like sum "if necessary to complete said development work and pay incidental expenses, said payment to be made within 30 days after notice that said sum, or any less sum, is necessary to complete said work." And it was further provided, that failure to make such payment should be "deemed and taken as a surrender and cancellation of all right, title and interest of said defaulting party arising out of this agreement." It was further provided "that if ore is found in paying quantities a mill for the reduction of said ore shall be erected, and that if sufficient stock has not been sold or cannot then be marketed, to pay the cost of constructing said mill, an assessment may be levied upon the stock issued;" and further, that "none of the parties hereto shall sell or pledge his stock or any part thereof, until he shall have offered same to the other parties hereto at such price as the proposed purchaser has offered in good faith to pay." It was also further provided that "when the develop-

ment work has been completed, and if ore is found sufficient in quantity and quality to justify the erection of a mill the remaining stock [four-fifths of the whole] shall be issued in equal amounts to each of the parties hereto." The complainant testified that shortly after the execution of the agreement of April 10, 1912, he had an arrangement with the directors under which the salary of $125 a month was to be allowed him as superintendent of the company's operations in Illinois; that the salary "was to be applied as against whatever expenses were being incurred in putting the money into the treasury of the company; I was not to pay any money into the treasury of the company, but my salary was to be applied as against that." Garrison, the president of the company, denies that any such arrangement was made with the complainant. And the minutes of the company do not disclose the appointment of the complainant as superintendent at a salary or any understanding that he was to be allowed a credit for outlays by him while acting in such capacity. But the performance of an act or the existence of a fact does not depend upon the record which may be made of it, and the silence of the minutes does not afford conclusive evidence that it has not transpired. It appears that there was much looseness or carelessness in the making or omission to make entries in the minutes of the proceedings of the directors. The complainant's statement on this subject is natural and inherently probable and he is corroborated by McGillick, one of the directors. The latter testified that the complainant "was to receive one hundred and twenty-five dollars per month," and "was to generally superintend the proposition, run the work and look after the buying of materials, and the general interest of the company." Confirmatory evidence of, the truth of the complainant's statement, in this connection is furnished in a letter from Garrison to the complainant under date of February 11, 1913, in which the former said:

"We are willing to do anything we can to help and we are not asking you to contribute to the money that we have to raise here," etc.

Both the weight of the evidence and the probabilities of the case support the conclusion that the complainant was to receive from the company as superintendent a salary of $125 a month, and was also to be credited for any outlays or expenses made or incurred by him in that capacity. His duties as superintendent clearly were not embraced among those he owed as director. I shall not undertake to enter by way of discussion into the labyrinth of details involved in the ascertainment of the amount to which the complainant became entitled as a credit upon the part or proportion of stock he might have a right to claim under the agreement of April 10, 1912, by reason of his services as superintendent and his outlay of moneys while acting in that capacity. I am satisfied by the evidence, oral and documentary, direct and circumstantial, that such amount is, as claimed by the complainant, $3,195.92, of which $1,375 consisted of his salary for eleven months.

The defendants further contend that pursuant to various resolutions of the directors and stockholders of the company its shares of stock

were so distributed that there remain no shares for the complainant other than nine and one-half shares on which he has received dividends. But the fact that no additional shares were left for him affords no justification or excuse for a wrongful disposition of stock which the complainant was entitled to receive, nor can it bar him from receiving appropriate redress under the prayer for other and further relief.

[6] The agreement of April 10, 1912, provided that the parties should pay, if required, the sum of $600 in settlement of the debts then existing against the company, the complainant agreeing to pay "any additional amount necessary to fully pay said outstanding claims," and further, that the complainant would "protect his associates against any demands or claims of persons heretofore associated or interested with him in said lease." But there is no proof of claims against the company then outstanding exceeding $600 nor that the company has ever been disturbed in its enjoyment of the leased property or that either the company or his associates therein had been compelled to settle any demands or claims made upon them by any person or persons theretofore interested or associated with him in the lease. The agreement of April 10, 1912, provided, as has appeared, that when the development work had been completed and if ore should be found in quantity and quality to justify the erection of a mill 8,000 shares of the capital stock, being the entire stock after deducting 2,000 shares which were to remain as treasury stock, to be thereafter sold when and as ordered by the board of directors, should be issued in equal amounts to Beltz, McGillick, Fritch and Garrison. It has been established that the development work was completed and that ore was found sufficient in quantity and quality to justify the erection of a mill, and that a mill was accordingly erected. It is admitted in the defendants' brief that "ore was found on said land about September 1, 1913, in sufficient quantity and quality to justify the erection of a mill." The complainant thereby presumptively became entitled to receive one equal fifth part of the total capital stock, namely, 2,000 shares, amounting to $100,000 on a capitalization of $500,000, or 40 shares amounting to $2,000 on a capitalization of $10,000, or 100 shares amounting to $5,000 on a capitalization of $25,000. Yet with the exception of 9½ shares, representing $475 at par, and dividends thereon during a certain period, the defendants have refused to recognize any right, title or claim on the part of the complainant to either stock or dividends. The agreement of April 10, 1912, while contemplating and providing for the issuance and sale of the treasury stock, being one-fifth of the total capital, so far as necessary "to pay the cost of constructing said mill," provided for the payment of the balance, if any, of such cost of construction through an assessment, and only through an assessment, to be levied upon the four fifths of the stock to be issued respectively to the four parties to the agreement. It is proved and admitted that no such assessment was ever made and that stock, other than treasury stock, was sold for the purpose of defraying the cost of developing and operating the property. Such sale so far as it encroached upon the part or proportion of the capital stock coming

to the plaintiff under the provisions of the agreement of April 10, 1912, was made against his consent and protest and in violation of his right to have such part or proportion remain unimpaired and undiminished save in so far as necessary to enforce the payment of an assessment duly levied. Under the operation of the agreement the complainant's share or proportion of the capital stock was impressed with a trust in his favor and was not liable either at law or in equity without his consent to be taken and sold to other persons save by due process of law, which was not resorted to. I am not aware of any provision in the laws of Delaware or of any principle of law or equity which can be successfully invoked to justify or excuse the action of the defendant or its directors in their attempt to strike down the rights of the complainant through an unauthorized, arbitrary and illegal disposal of the stock to which he was entitled.

The prime cause of difficulty in this case was the wrongful departure by the defendant and its directors from an observance of the plain and unmistakable provisions of the contract of April 10, 1912. This action on their part necessarily introduced into the case confusion and complication and has resulted in an adoption by them of an arbitrary and oppressive course toward the complainant.

[7] It is admitted in the answer that out of the total issue of 500 shares constituting the capital stock of the company as raised to $25,-000, 29½ shares remain in the treasury of the company; 9½ shares have been issued to the complainant; 147 shares are held by the other parties to the contract of April 10, 1912, namely, McGillick, Fritch and Garrison; and 314 shares are in the names of other persons. The whole 500 shares are thus accounted for. 147 shares issued to McGillick, Fritch and Garrison, if divided equally between them, would be 49 shares for each. Having been issued at par each of them has received dividends amounting to 200%, beginning May 29, 1914, up to November, 1915, and since the latter date 165% additional, aggregating 365%. Thus McGillick, Fritch and Garrison have each received in dividends $8,942.50. The complainant received on 9½ shares, the par value of which was $475, 200% in dividends, from May 29, 1914, until November, 1915, aggregating $950, but has received no additional dividends. Thus he has received by way of dividends only $950 as against $8,942.50, received by each of the other parties to the agreement of April 10, 1912. And this is the net result so far as dividends are concerned of his association and dealings with the defendants in this case. The complainant is a man of but little education, and undoubtedly inconsistencies and discrepancies on minor points are disclosed in his testimony. But it is against the dictates of self-interest and the known rules of human conduct that after acquiring the mining lease and turning it over to the company in consideration of which its total capital stock was issued, he should in surrendering the stock to the company under the agreement of April 10, 1912, have intended or contemplated that it would be so manipulated as to produce the grotesque result the defendants seek to justify. On the evidence I am satisfied that the complainant was wronged and victimized by persons, for whose acts the company was responsible, whom he benefitted by

taking them into the company under the agreement of April 10, 1912, and who have practically thrown him out.

[8] After the filing of answer in this case the company went into bankruptcy, and it is not possible for the complainant to receive adequate redress as against it. But the four individual defendants and J. B. Laubach, against whom proceedings in civil contempt had been instituted for alleged violation of the restraining order theretofore awarded in this suit, each paid into the registry of this court the sum of $1,500, aggregating $7,500, to abide the further order of the court, with a view to the saitsfaction in whole or in part of any demand which should be determined to exist in favor of the complainant by reason of the matters involved in this suit. I am satisfied that under the prayer for other or further relief the complainant is entitled to redress at least in part for the wrong he has suffered at the hands of the defendants. The sum of $3,195.92 for which the complainant is entitled to claim credit on account of his part or proportion of stock under the agreement of April 10, 1912, is largely in excess of the par value of the stock issued at par to each of the other parties to that agreement on which each has received dividends aggregating $8,942.50. If dividends amounting to 365% should be allowed to the complainant upon only a similar amount, namely, $2,450, and further, if the amount received by him by way of dividends on the 9½ shares from May 29, 1914, to November, 1915, namely, $950, be deducted from the amount of dividends received by each of the other parties to that agreement, the amount which he is in equity entitled to receive would be $7,992.50, which is $492.50 in excess of the sum paid into court. The claim of the complainant being in excess of the amount so paid into court, he is entitled to receive the money so paid in after the deduction therefrom of the costs of this cause.

A decree in accordance with this opinion may be prepared and submitted.