In re Joseph L. VIANESE, Constance
A. Vianese, Debtors.

Bankruptcy No. 95–60060.

United States Bankruptcy Court,
N.D. New York.

Jan. 19, 1996.

**63**

James Selbach, Syracuse, New York, for Debtors.

Michael Collins, Assistant U.S. Trustee, Utica, New York.

MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

STEPHEN D. GERLING, Chief Judge.

This matter is before the Court on the motion of Michael E. Collins, Esq., Assistant

United States Trustee ("UST"), filed on June 9, 1995, to dismiss the filing of the Chapter 7 petition ("Petition") of Joseph L. Vianese ("J. Vianese") and Constance A. Vianese ("C. Vianese") (hereinafter jointly referred to as "Debtors"). The UST asserts that granting a discharge under Chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code") would be a substantial abuse of the chapter pursuant to Code § 707(b).

The motion was orally argued at regular motion terms of the Court held on July 18, 1995 and August 8, 1995, in Syracuse, New York. An evidentiary hearing was commenced on September 27, 1995, and continued on October 13, 1995. In lieu of closing arguments, the parties were requested to provide the Court with memoranda of law in support of their respective positions. The matter was submitted for decision on November 9, 1995.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(A).

### FACTS

On January 6, 1995, the Debtors filed their Petition pursuant to Chapter 7 of the Code. According to the Summary of Schedules attached to the Petition, the Debtors' assets total $177,101, which include Debtors' residence in Baldwinsville, New York, valued by Debtors at $170,000 (see Schedule A of UST's Exhibit A). Debtors' liabilities total $595,-189.25 and include secured debt of $153,558 and $441,631.25 in unsecured debt.[1] The secured debt is comprised of a first mortgage in the amount of $25,525 and a home equity loan in the amount of $128,033 (see Schedule D of UST's Exhibit A). Of the unsecured debt, $193,420 is designated as a contingent

---

**1.** Although the Debtors filed an amendment to their schedules on July 17, 1995, adding American Honda Finance Corporation as an unsecured creditor owed $22,671.30 in connection with a lease on an Acura Legend driven by C. Vianese, this debt is not included in the total since Debtors testified that the lease had subsequently been rejected and the vehicle surrendered to the lessor.

claim in the form of a personal guarantee of C. Vianese on a corporate promissory note (*see* Schedule F). C. Vianese testified that the note was given to evidence that monies had been loaned to Vendors and Purchasers, Inc. ("Vendors & Purchasers"), a corporation in which she had been a shareholder until the sale of her shares in October, 1994.[2,3] It was her testimony that she was actually uncertain of the amount still owing on the promissory note. It was also her testimony that she had received no demand for payment on the note pursuant to her guarantee.

Also listed in Schedule F of the Petition were debts to four different casinos, totalling $86,500, incurred by J. Vianese as a result of gambling activities. Although J. Vianese could not recall whether the debt of $16,500 to the Turning Stone Casino, in Verona, New York, was incurred before or after September, 1994, he testified that the most of the balance of $70,000 was incurred on a trip to Atlantic City, New Jersey, the latter part of September, 1994, which he described as "the fateful trip" when "the debt" was incurred. J. Vianese also testified that in addition to the promissory notes issued to the four casinos, a portion of the credit card debt listed in Schedule F of the Petition was attributed to cash advances obtained in connection with his gambling activities. According to the Amended Statement of Financial Affairs, Debtors estimated that $150,000 in gambling losses had been incurred within one year prior to filing their Petition (*see* UST's Exhibit M, Response to Question # 8).

In addition to the debt owed the four casinos, Debtors listed thirteen other unsecured debts, including not only credit card debts, but also several lines of credit and a consolidation loan all totalling $88,807.25. Also listed was a debt of $42,570 in connection with a loan made against J. Vianese's tax sheltered annuity and a debt owed to Great Lakes Higher Education in the amount of $30,234 in connection with student loans on behalf of the Debtors' two sons.

With respect to the various credit card debts, the UST elicited testimony from J. Vianese that the Debtors had ceased making payments on the various accounts in October 1994 when they became due (*see* UST's Exhibits J, K and L). However, Debtors entered into a lease for a 1994 Toyota Camry, driven by J. Vianese on October 10, 1994. The Debtors also purchased a 1990 Plymouth Laser on October 20, 1994, for $6,500 using the proceeds borrowed against J. Vianese's annuity. The $6,500 payment was not listed in the original Statement of Financial Affairs filed with their Petition; however, it was included in the Debtors' Amended Statement of Financial Affairs presented to the UST at the 2004 examination (*see* UST's Exhibit M, Response to Question 3(a)). Also listed in the Amended Statement of Financial Affairs were payments totalling $2,561.31 made to three other creditors on October 20, 1994.

According to Schedule I, which was filed with the Petition on January 6, 1995, the Debtors' combined monthly income, after deductions, was $6,766.15. However, at the hearing, C. Vianese testified that she was no longer employed. It was her testimony that Teelin had hired some of his relatives to work at Vendors & Purchasers and she had become concerned about the possibility of termination since many of her duties and responsibilities had diminished. She had inquired about the likelihood of her continued employment and was provided with a letter of termination in July, 1995, indicating that her services would no longer be required. She testified that she had not sought full-time employment since receiving the termi-

---

**2.** According to the Debtors' Amended Statement of Financial Affairs, presented to the UST at the 2004 examination on April 4, 1995, C. Vianese transferred one share of stock in Vendors & Purchasers to Thomas Teelin ("Teelin") in June, 1994 and transferred her remaining shares to him in November, 1994, for $1,000 (*see* UST's Exhibit M, Response to Question # 10).

**3.** In their original Statement of Financial Affairs, filed with their Petition on January 6, 1995, the Debtors listed no businesses in which either debt- or was an officer, director, partner or managing executive within the two years preceding the commencement of their case. However, according to the Amended Statement of Financial Affairs presented to the UST at the 2004 examination on April 4, 1994, C. Vianese was not only a shareholder in Vendors & Purchasers, she also had been a partner in two entities which went out of business in the fall of 1994 (*see* UST's Exhibit M, Response to Question # 16(a)).

nation notice, although she had taught a couple training courses for the Greater Syracuse Board of Realtors. She testified that in addition to being a licensed real estate broker, she also was certified as a teacher with a B.S. in education. It was her opinion that demand for her services in either field of endeavor was likely to be minimal.[4]

At the time the Debtors filed their Petition, J. Vianese held the position of Assistant Superintendent for Business for the Oswego Board of Cooperative Education Services ("BOCES") and was receiving a net monthly salary of $4,307.51 per month. At the 2004 examination held on April 4, 1995, the Debtors provided the UST with a statement written by J. Vianese and identified as "Additional Expense [and] Income Considerations" ("Written Statement") (*see* UST's Exhibit D). In the Written Statement, J. Vianese indicated that his salary for 1994–95 had been frozen and his position as Assistant Superintendent for Business was to be eliminated as of July 1, 1995. However, at the evidentiary hearing, he testified that as of July 1, 1995, under a restructuring program, he had been given the new title of Executive Director of Management and Business Services and had also been given a raise of $1,500. His current gross annual salary is approximately $80,674.

In the Written Statement J. Vianese also indicated that he was being encouraged to retire in August 1995. At the 2004 examination he had explained to the UST that New York State was prepared to offer certain employees an incentive to retire. However, at the evidentiary hearing, he testified that he was not eligible for that particular program, but was hopeful that the same incentive would become available to participants such as himself in the New York State Teachers' Retirement System. In fact, in the Written Statement he indicated that he already had submitted a statement of retirement to the BOCES Board of Directors, to be effective June 30, 1997, although the Board of Directors had not acted on it as of the date of the 2004 examination. According to the Written Statement, both Debtors eventually intended to retire and move to Florida.[5]

According to Schedule J, which was included with the Petition, Debtors' monthly expenses as of December 20, 1994, totalled $8,420.84 (*see* UST's Exhibit A). In conjunction with the hearing, the Debtors provided the Court with a revised list of expenses intended to reflect their current expenditures (*see* Debtors' Exhibit 16). For comparison purposes, they are listed below:

|  | UST's Exhibit A | Debtors' Exhibit 16 |
| --- | --- | --- |
| Home Mortgage | $ 284.50 | $ 284.50 |
| Electricity & heating fuel | 475.00 | 279.08 |
| Water & sewer | 12.50 | 12.50 |
| Telephone | 125.00 | 72.70 |
| Waste Removal/Recycle | 26.67 | 25.56 |
| Cable | 35.00 | 35.00 |
| Cellular telephone | 95.00 | — |
| Home maintenance | 190.00 | 100.00 |
| Food | 860.00 | 300.00 |
| Clothing | 200.00 | 50.00 |
| Laundry & dry cleaning | 215.00 | 90.45 |
| Medical & dental expenses | 125.00 | 72.92 |
| Transportation | 321.50 | 250.00 |
| Recreation, clubs, etc. | 150.00 | 50.00 |
| Charitable contributions | 43.00 | 43.00 |
| Insurance: | | |
|     Homeowners | 50.00 | 50.00 |

4. C. Vianese testified that in spite of a lack of demand for her services, she continued to maintain a current membership in the Greater Syracuse Board of Realtors.

5. C. Vianese would be 53 years old in December, 1995. She also testified that her husband was 55 or 56 years old at the time of the evidentiary hearing.

| | UST's Exhibit A | Debtors' Exhibit 16 |
|---|---|---|
| Life | 1,083.67 | 250.00 |
| Health | — | 21.97 |
| Auto | 162.50 | 162.00 |
| Dental | — | 2.45 |
| Real Property taxes | 400.00 | 286.54 |
| Installment payments: | | |
| 1992 Acura Lease | 480.25 | — |
| 1994 Toyota Camry Lease | 279.00 | 279.00 |
| Home Equity Mtge. | 1,033.08 | 1,144.18 |
| Son's tuition | 1,666.67 | — |
| Educational loans | — | 387.56 |
| Other: | | |
| Housecleaning services | 107.50 | — |
| AAA | — | 3.08 |
| Auto Lease Excess mileage | — | 129.54 |
| Roof repair | — | 258.33 |
| Septic cleaning | — | 15.00 |
| Veterinarian | — | 3.60 |
| TOTAL EXPENSES | $8,420.84 | $4,658.96 |

With respect to the item identified as "Roof repair", J. Vianese explained in his Written Statement that in order to be able to sell their house upon retirement they anticipated that it would be necessary to replace the roof; otherwise, it was unlikely that any prospective purchaser would be able to qualify for a mortgage on Debtors' residence. The Debtors presented the testimony of Thomas Tyler, a certified home inspector who had examined the interior and exterior of the Debtors' residence. Although he had not measured the roof, he estimated that it would cost between $8,000 and $9,000 to replace the roof. It was his testimony that the house had sustained previous water damage and that 90% of the roof needed to be replaced. He admitted that there were four areas of leakage, mostly on the roof of the addition, but that the main structure, while not leaking because of its extreme pitch, contained worn and granular shingles with only 3–4 years' life left, in his opinion. He acknowledged that there was no structural problem at the time of his inspection and that the rafters were sound. He expressed concerns regarding the effects of the previous water damage on the efficiency of the insulation and the strength of the plywood under the shingles in certain areas of the roof.

## DISCUSSION

### I. UST's "Request for Admissions"

At the evidentiary hearing, the UST requested that the Court make certain findings based on the fact that the Debtors had failed to serve a response to his original motion filed pursuant to Code § 707(b). The UST asserts that the following should be deemed admitted by the Debtors: (1) Debtors are individuals; (2) Debtors have primarily consumer debts, and (3) Debtors meet the debt limits set forth in Code § 109 and are eligible for relief pursuant to Chapter 13 of the Code. The UST acknowledges that there is a dispute as to whether granting the Debtors a discharge under Chapter 7 would be a "substantial abuse." Debtors admit that they are individuals and are eligible to seek relief pursuant to Chapter 13 of the Code. However, Debtors contend that it is for the Court to determine whether they have primarily consumer debts.

The failure to respond to a request for admissions pursuant to Rule 7036 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") constitutes admission of each matter for which admission was sought and can serve as the factual predicate for a motion for summary judgment in the context of an adversary proceeding pursuant to Fed. R.Bankr.P. 7056. However, there has been no formal request for admissions sought from

the Debtors. Instead, the UST bases his request on Local Rule 913.1, which requires that answering papers in opposition to a written motion be filed and served unless the motion is one which may be considered *ex parte*. The Court has indicated that Local Rule 913.1 is to be strictly enforced and that it will not consider opposition by a party that has not complied with the requirements of Local Rule 913.1. However, there is nothing in the language of the rule that provides for the relief now sought by the UST.

Furthermore, Fed.R.Bankr.P. 1017(e), the procedural mechanism for seeking the dismissal of a case pursuant to Code § 707(b), requires only that the UST's motion "advise the debtor of all matters to be considered by the court at the hearing." It does not require that there be any written response to the motion and, according to the Advisory Committee Notes in 1987 when Fed.R.Bankr.P. 1017(e) was originally enacted, a debtor's failure to attend the hearing is not to be a ground for dismissal pursuant to Code § 707(b). It follows that the Debtors' failure to serve and file a written response, while perhaps putting the UST at a procedural disadvantage, is not a basis for dismissal and in this contested matter should not be deemed an admission that they have primarily consumer debts. The fact that the Debtors are required to receive notice of the motion but need not appear at the hearing arguably may be "considered *ex parte* " for purposes of Debtors' compliance with Local Rule 913.1. In addition, whether or not their debts are *primarily* consumer debts is a matter for the Court to determine after a careful review of the Debtors' schedules and arguably is not appropriate for admission by the Debtors.

## II.  *Code § 707(b) Analysis*

■ One of the main purposes of bankruptcy law historically has been to relieve honest debtors from the weight of oppressive indebtedness, thereby allowing them to start afresh. *In re Krohn,* 886 F.2d 123, 125 (6th Cir.1989) (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). However, a Constitutional right to a bankruptcy discharge has never existed, and Congress may deny access to bankruptcy as it sees fit. *U.S. v. Kras,* 409 U.S. 434, 446–47, 93 S.Ct. 631, 638–39, 34 L.Ed.2d 626 (1973).[6]

For years, access to bankruptcy protection was not limited in any significant fashion, and debtors "enjoyed a virtually unfettered right to a 'fresh start' under Chapter 7, in exchange for liquidating their nonexempt assets for the benefit of their creditors." *In re Green,* 934 F.2d 568, 570 (4th Cir.1991). However, in 1984 Congress moved to limit access to Chapter 7 under certain circumstances by adding § 707(b) to the Code.[7] Section 707(b) provides that upon its own motion, or that of the U.S. Trustee, a court may dismiss an individual Chapter 7 case if the debts involved are "primarily consumer debts" and the court finds that granting relief would constitute a "substantial abuse" of the provisions of Chapter 7.

■ As Code § 707(b) indicates, a finding of substantial abuse will only be supported where a debtor is seeking to discharge consumer debts. Therefore, before any question of substantial abuse can be addressed under Code § 707(b), a threshold inquiry must be undertaken to determine whether the debts in issue are consumer debts.

### A.  *Consumer Debt*

■ The Code defines consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). In determining whether a given debt comports with this definition, it is necessary to focus broadly upon the purpose for which the debt is incurred; consum-

---

6. Although not expressly authorized by statute, it was well established under the former Bankruptcy Act that bankruptcy courts could convert or dismiss cases where the granting of relief under the chapter chosen by the debtor would unfairly prejudice the rights of creditors. *In re Higginbotham,* 111 B.R. 955, 961 (Bankr. N.D.Okla.1990) (citations omitted).

7. Title III of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 355, added the so-called "consumer credit amendments" to the Code, which included § 707(b).

er debts have no profit motive, while business debts do. *In re Booth,* 858 F.2d 1051, 1054–55 (5th Cir.1988); *In re Berndt,* 127 B.R. 222, 224 (Bankr.D.N.D.1991).

■ Some courts have interpreted the language "primarily consumer debts" in Code § 707(b) to require that consumer debt exceed 50% of the total amount of debt. *See e.g. In re Kelly,* 841 F.2d 908, 913 (9th Cir. 1988). Other courts have also required that the number of consumer debts *also* exceed at least half of the total number of debts as well. *See e.g. Booth, supra,* 858 F.2d at 1055; *In re Johnson,* 115 B.R. 159, 162 (Bankr. S.D.Ill.1990); *Accord Higginbotham, supra,* 111 B.R. at 960. The Court believes that this latter approach is a reasonable and proper reading of the Code § 707(b) consumer debt requirement and will apply these standards to the present case.

■ The Debtors herein have two secured debts totalling $153,558 and twenty unsecured debts totalling $464,302.55, for a total liability of $617,860.55. Of the unsecured debt, $193,420 was listed as a contingent claim in the form of a personal guarantee of a corporate promissory note by C. Vianese. Also listed was a debt of $22,671.30 for the lease on the 1992 Acura Legend previously driven by C. Vianese in connection with her employment with Vendors & Purchasers. According to the Debtors' testimony, the lease has since been rejected and the vehicle surrendered to the lessor. These debts, totalling $216,091.30 and representing 35% of the total debt,[8] were incurred for business purposes and are not considered to be consumer debts. Subtracting these two debts, the balance of the debts total $401,769.25.

■ The Court in a previous decision rendered in connection with this case concluded that gambling debts are consumer debts. *See In re Vianese,* Case No. 95–60060, Adv.Pro. No. 95–70066, slip op. at 9 (Bankr.N.D.N.Y. November 3, 1995). The first mortgage on the Debtors' residence, as well as the home equity loan, are also to be considered debts incurred primarily for personal purposes. *See Kelly, supra,* 841 F.2d at 913. So too the student loans made in furtherance of the Debtors' sons' education were for "family purposes" and should be considered consumer debt. The Debtors testified that neither the credit card debt, the lines of credit or the monies borrowed against J. Vianese's annuity were used for anything but personal and/or family purposes, primarily gambling. Therefore, out of twenty-two debts, twenty are consumer debts and more than 65% of the total amount of debt incurred by the Debtors consist of consumer debts. The Court, therefore, finds that the indebtedness satisfies the "consumer debt" prerequisite of Code § 707(b) and turns its inquiry to whether the granting of a discharge to the Debtors would be a substantial abuse of Chapter 7.

### B. *Substantial Abuse*

■ The term "substantial abuse" is not defined anywhere in the Code, and it is, therefore, not surprising that its meaning within the context of Code § 707(b) has been the subject of a good deal of diverse judicial interpretation. *See e.g. U.S. Trustee v. Harris,* 960 F.2d 74 (8th Cir.1992); *Green, supra,* 934 F.2d 568; *Krohn, supra,* 886 F.2d 123; *In re Walton,* 866 F.2d 981 (8th Cir.1989); *Kelly, supra,* 841 F.2d 908. Dismissal may be based on a lack of honesty or upon a debtor's lack of need. *Krohn, supra,* 886 F.2d at 126. The courts are in agreement that the principal factor to be considered in the determination of substantial abuse is the availability of future income to repay prepetition debts for which a discharge is sought. *See e.g. Kelly, supra,* 841 F.2d at 914 (citations omitted); *Waites v. Braley,* 110 B.R. 211, 214 (E.D.Va.1990) (citations omitted); *Johnson, supra,* 115 B.R. at 163. However, the court in *Kelly* went one step further in its analysis and applied a *per se* rule whereby the filing of a Chapter 7 petition when a

---

**8.** There is some question regarding the extent of C. Vianese's liability on the guarantee, if any, since she testified that there had been no demand made and there was also a second guarantor on the promissory note. Also, since the Acura Legend has been surrendered to the creditor, it appears that the Debtors' liability on this lease may be less that the amount scheduled by the Debtors. It may well be that both debts actually constitute significantly less than 35% of the total debt.

debtor's income exceeds necessary expenses constitutes substantial abuse. *See Kelly, supra,* 841 F.2d at 915. In *Harris* the Court of Appeals for the Eighth Circuit, in an effort to clarify its earlier decision in *Walton* in which it had relied on *Kelly,* agreed with the district court that "the ability to fund a chapter 13 plan can be sufficient reason to dismiss a chapter 7 petition under § 707(b)." *Harris, supra,* 960 F.2d at 77. *See also Waites, supra,* 110 B.R. at 217 ("Debtor's ability to repay his debts from future income, by itself, may preclude discharge of the debts under chapter 7.").

■ The Court of Appeals for the Fourth Circuit in *Green* was not persuaded by the reasoning in *Kelly* and concluded that a determination of substantial abuse must be made on a case-by-case basis. *See id.* at 571–572; *see also Higginbotham, supra,* 111 B.R. at 964 ("Debtor's ability to repay some part of their debts does not, per se, bar them from Chapter 7."). Citing *inter alia* to a previous decision of this Court (*In re Peluso,* 72 B.R. 732 (Bankr.N.D.N.Y.1987)), the court in *Green* concluded that a debtor's ability to repay prepetition debt is to be given significant weight in any analysis pursuant to Code § 707(b), but it must be balanced along with other mitigating circumstances that might exist. *Green, supra,* 934 F.2d at 572; *Accord In re Martin,* 107 B.R. 247, 248–249 (Bankr.D.Alaska 1989) (Court in its discretion may deny a motion to dismiss even if the debtor is able to repay debts based on mitigating factors.) This includes consideration of

(1) whether the debtors have a likelihood of sufficient future income to fund a Chapter 13 plan which would pay a substantial portion of the unsecured claims;

(2) whether the debtor's [sic] petition was filed as a consequence of illness, disability, unemployment or some other calamity;

(3) whether the schedules suggest the debtors incurred cash advances and consumer purchases in an excess of their ability to repay them;

(4) whether the debtors' proposed family budget is excessive or extravagant; and

(5) whether the debtors' statement of income and expenses is misrepresentative of their true financial condition.

*Peluso, supra,* 72 B.R. at 738 (citations omitted). Furthermore, in any analysis, there is to be a "presumption in favor of granting the relief requested by the debtor." Code § 707(b).

■ The analysis of the Debtors' ability to repay a significant portion of their prepetition unsecured debt must begin with a determination of the amount of that debt. In this instance, the Debtors have listed $441,631.25 in unsecured debt, including the contingent liability of C. Vianese in the amount of $193,-420. C. Vianese testified that she was actually uncertain of the amount of the contingent liability, and no demand had been made on her in connection with her personal guarantee on the loan to Vendors & Purchasers. She also testified that she was a co-guarantor on the loan, along with one of the other original shareholders. Based on the testimony, the Court concludes that the debt of $193,420 should not be included in this particular phase of its analysis. In addition, the Court deems it inappropriate to include the $30,234 in student loans in its calculation of unsecured debt since it is nondischargeable.[9] *Accord Kelly, supra,* 841 F.2d at 914 (Determination of substantial abuse focuses on debtor's ability to repay the debts for which a *discharge* is sought (emphasis added)).

■ Finally, the Court takes exception to the inclusion of $42,570 identified by the Debtors as repayment on a loan made against J. Vianese's annuity. As was discussed in a recent decision of this Court, the obligation to repay such loans is not a "debt" as the loan "actually constitutes 'a use of borrowers' own contributions rather than a lending of additional funds." *In re Delnero,* 191 B.R. 539, 544 (Bankr.N.D.N.Y.1996) (quoting *In re Goewey,* 185 B.R. 444, 446 (Bankr.N.D.N.Y.1995)). Deducting these three alleged "debts," totalling $266,224, the Debtors owe $175,407.25 in unsecured debt

---

**9.** Code § 523(a)(8) is not limited in its application to educational loans in which the student is the borrower. *In re Pelkowski,* 990 F.2d 737 (3d Cir.1993); *In re Feenstra,* 51 B.R. 107, 110–11 (Bankr.W.D.N.Y.1985).

for purposes of determining their ability to repay a *substantial* portion of said debt.

As was discussed previously, the Debtors' net income, based on only J. Vianese's salary, is $4,307.51 per month. According to Debtors' Exhibit 16, they estimate monthly expenses to be $4,658.96. The UST has proposed a number of adjustments to reflect what he considers to be expenses which are unnecessary for the reasonable maintenance and support of the Debtors, i.e. that will not deprive them of adequate food, clothing, shelter and other necessities. They include the deletion of the $258.33 allocated for roof repair, $387.56 for the nondischargeable student loans, and the estimated cost for excess mileage on the lease of the Toyota Camry in the amount of $129.54 per month, as well as the reduction in various other categories of expenses as follows: [10]

| | Schedule I Debtors' Exhibit 16 | UST's Proposed Adjusted Expenses |
|---|---|---|
| Home Mortgage | $ 284.50 | $ 284.50 |
| Electricity & heating fuel | 279.08 | 279.08 |
| Water & sewer | 12.50 | 12.50 |
| Telephone | 72.70 | 45.00 |
| Waste Removal/Recycle | 25.56 | 25.56 |
| Cable | 35.00 | — |
| Home maintenance | 100.00 | 50.00 |
| Food | 300.00 | 300.00 |
| Clothing | 50.00 | 50.00 |
| Laundry & dry cleaning | 90.45 | 45.00 |
| Medical & dental expenses | 72.92 | 72.92 |
| Transportation | 250.00 | 125.00 |
| Recreation, clubs, etc. | 50.00 | 100.00 [11] |
| Charitable contributions | 43.00 | |
| Insurance: | | |
|     Homeowners | 50.00 | 50.00 |
|     Life | 250.00 | 100.00 |
|     Health | 21.97 | 21.97 |
|     Auto | 162.00 | 107.00 [12] |
|     Dental | 2.45 | 2.45 |
| Real Property taxes | 286.54 | 286.54 |
| Installment payments: | | |
|     1994 Toyota Camry Lease | 279.00 | 279.00 |
|     Home Equity Mtge. | 1,144.18 | 1,144.18 |
|     Educational loan | 387.56 | — |
| Other: | | |
|     AAA | 3.08 | — |
|     Auto Lease Excess mileage | 129.54 | — |
|     Roof repair | 258.33 | — |
|     Septic cleaning | 15.00 | — |
|     Veterinarian | 3.60 | — |
| TOTAL EXPENSES | $4,658.96 | $3,380.70 |
| TOTAL MONTHLY INCOME | $4,307.51 | $4,307.51 |
| "DISPOSABLE" INCOME | ($-351.45) | $ 926.81 |

■ Generally, if a debtor is able to fund repayment of more than 50% of his/her debts

---

10. Those items which vary from those proposed by the Debtors appear in boldface type.

11. UST has combined recreation, cable, charitable contributions and veterinary expenses into one category.

12. Debtors agreed that automobile insurance should be reduced by one-third to reflect the fact that they no longer would require coverage on the Acura Legend.

through a Chapter 13 plan, the courts have been inclined to dismiss the case for substantial abuse of Chapter 7. *In re Smith,* 1995 WL 20345 at *2 (Bankr.D.Idaho 1995) (citations omitted). Based on the UST's proposed adjustments, Debtors' expenses are estimated to total $3,380.70 per month, leaving $926.81 in "disposable" income. If the Court were to accept the UST's proposed adjustments, under a Chapter 13 plan of 36 months, the Debtors would be able to make total payments of approximately $33,372 (36 × $927) over a minimum of three years and approximately $55,620 (60 × $927) over a period of a maximum of five years. Without taking into account attorney's fees or the trustee's fee, this represents a dividend to the unsecured creditors whose claims the Debtors' propose to discharge in a Chapter 7 of 19% ($33,372/$175,407.25) and 31.7% ($55,620/$175,407.25), respectively. The fact that the Debtors are unable to repay more than 50% of the unsecured debt they seek to discharge through a Chapter 13 plan does not standing alone preclude the Court from granting the UST's motion, nonetheless.

"Where the debtor is able to pay less than 50% but is still able to make a substantial contribution to his creditors and there are aggravating circumstances the courts have also denied relief." *Id.* This comports with the Court's earlier discussion to the effect that in considering a motion pursuant to Code § 707(b), the Court must also examine, on a case-by-case basis, any mitigating circumstances concerning the filing of the Petition.

■ In this regard, the Court has already addressed the first factor cited in *Peluso, supra,* namely whether the Debtors would be able to repay a substantial portion of the unsecured claims by funding a Chapter 13 plan. With respect to the second factor, the Debtors' Petition was not filed as a result of illness, disability, unemployment or "some other calamity." While the Debtors may perceive the substantial gambling losses incurred on that "fateful trip" in September 1994 to Atlantic City as a "calamity", from the Court's perspective the Debtors' losses were well within their control and are to be distinguished from illness, disability, etc.

■ The third factor requires a determination of whether the Debtors have incurred cash advances and credit in excess of their ability to repay them. Gambling losses are to be looked at "as an excess similar to other excesses associated with living beyond one's means. A debtor who finances excess gambling losses through the use of a credit card is no different from a debtor who uses a credit card to take a vacation or to make purchases he cannot afford." *In re Hammer,* 124 B.R. 287, 290 (Bankr.C.D.Ill.1991). In this case, the J. Vianese testified that in addition to the "markers" signed with the casinos, he also made cash advances on his various credit cards to fund his gambling. He also testified that no payments were made on the credit cards or lines of credit after September 1994, when the trip to Atlantic City occurred.

The fourth and fifth factors require that the Court examine whether the Debtors' statements of income and expenses are misrepresentative of their true financial condition and whether their proposed budget is excessive or extravagant. In this regard, Debtors' original list of expenses, filed with their Petition, totalled $8,420.84 (*see* UST's Exhibit A, Schedule J). According to Debtors' Exhibit 16, which was submitted for evidentiary purposes, Debtors propose a reduction in expenses based in part on C. Vianese's loss of employment and the fact that at least one of their sons no longer resides with them. The new list of expenses totals $4,658.96, a reduction of $3,761.88 per month from the original Schedule J. The expense of electricity and heating fuel has been reduced by almost $200 from $475 per month to $279, which is the monthly average for heating Debtors' residence; costs associated with home maintenance have been reduced from $190 per month to $100; life insurance premiums have been reduced by approximately $750, from $1,083.67 per month to $250. In addition, the Debtors' original list of expenses included such items as a cellular phone ($95 per month) and housecleaning services ($107.50 per month), which do not appear on the revised list of expenses.

Looking at the revised list of expenses, the Court concurs with the UST that $250 per month to purchase life insurance with a $2 million death benefit is excessive when one considers the fact that those monies could be used to repay creditors. Indeed, at least one court has concluded that payment of life insurance premiums, unless mandatory, should be included in disposable income. *See In re Smith,* 187 B.R. 678 (Bankr.D.Idaho 1995). The court in *Smith* found that life insurance was not reasonably necessary for the debtor's maintenance and support. *Id.* at 679.[13]

The Court finds it rather extravagant that the Debtors elected to lease a new Toyota Camry in October 1994, at a time when they were unable to pay their other unsecured creditors. Certainly, there are other less expensive vehicles that were available to them, both new and used. In fact, it was also in October 1994 that the Debtors purchased the 1990 Laser, allegedly for C. Vianese's use, although at the time she was also driving a 1992 Acura Legend.

The courts in *Green* and *Krohn,* in balancing the various factors, also considered whether the debtors, in seeking relief pursuant to Chapter 7, had filed their petition in good faith. *See Green, supra,* 934 F.2d at 572; *Krohn, supra,* 886 F.2d at 126. Both courts were concerned not only with whether the debtors were non-needy and not entitled to a "head start," but also whether they were dishonest in any way and therefore not entitled to a "fresh start." Based on the evidence before it, this Court has no reason to conclude that the Debtors filed their petition in bad faith. There were certain omissions from their Statement of Financial Affairs, including failing to list the sale of C. Vianese's interest in Vendors & Purchasers in November, 1994, and her role as a partner in two entities that allegedly went out of business in the fall of 1994. Debtors also failed to list the purchase of the 1990 Laser in October 1994, and the payment of three other creditors that month using proceeds borrowed against J. Vianese's annuity. However, in view of the fact that there is a presumption in favor of the debtors, the Court does not consider these omissions to be so egregious as to warrant a finding of bad faith. The Court does have some concerns regarding C. Vianese's termination from her position postpetition and her failure to seek alternative full-time employment. According to J. Vianese's written statement, as well as his testimony, it is obvious that the Debtors are hoping to be able to retire to Florida in the next few years, essentially debt free. However, Debtors' financial planning for the future should not be at the expense of their creditors, even if debt repayment will be less than significant. As this Court noted in *Peluso,* "It is morally and legally unconscionable that a person should be able to extinguish his obligations without first making a reasonable effort to fulfill them." *Peluso, supra,* 72 B.R. at 737 (quoting *In re Hudson,* 56 B.R. 415, 419 (Bankr. N.D.Ohio 1985). In the matter *sub judice,* it appears that a significant portion of the debt was incurred in September of 1994, and the Debtors signed their Petition on December 20, 1994. During those ninety days, there was no evidence submitted to indicate that the Debtors made any attempts to arrange for repayment of these debts, electing instead to discharge them while continuing to receive a significant income and maintain a comfortable lifestyle for themselves. Therefore, upon due consideration of the totality of the circumstances, the Court must agree with the UST that the Debtors' filing of a petition pursuant to Chapter 7 is a substantial abuse of that chapter.

Based on the foregoing, it is

ORDERED that the UST's motion to dismiss Debtors' case for substantial abuse pursuant to Code § 707(b) is granted conditionally, and it is further

ORDERED that the Order dismissing the case shall become effective only, if, within 20 days of the date of this Order, Debtors fail to voluntarily convert their case to one under Chapter 13 pursuant to Code § 706(a).

---

13. This Court cites the *Smith* case only for purposes of discussion and without any expression of agreement or disagreement with its conclusion.