**In re Scott ROTHMAN a/k/a Scott Rothman, Dr., Debtor.**

**Bankruptcy No. 96–12167DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 17, 1996.

John J. Koresko, V, Norristown, PA, for Debtor.

Richard H. Anderson, Media, PA, for Andrew L. Mozino, Executor of the Estate of Joseph S. Mozino.

Edward Sparkman, Standing Chapter 13 Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The contested matters at issue in the instant Chapter 13 bankruptcy case of SCOTT ROTHMAN a/k/a Dr. Scott Rothman ("the Debtor"), present two issues: (1) the Debtor's objection ("the Debtor's Objection") to the proof of claim filed by Andrew L. Mozino, the executor of the estate of Joseph S. Mozino, a/k/a J.S. Mozino, deceased ("Mozino"), the landlord of the Debtor's failed carry-out bagel business; and (2) Objections to confirmation ("the Confirmation Objections") of the Debtor's Chapter 13 Plan ("the Plan") filed by Mozino and joined by the Standing Chapter 13 Trustee, Edward Sparkman ("the Trustee").

The issue raised by the Debtor's Objection is whether a confessed judgment entered against him personally is valid, in light of Mozino's agreement to cross out his name as co-lessee with Stoney Creek Bagels, Inc. ("Stoney Creek") on the lease, even though he signed the lease as "Individual" as well as "Pres." of Stoney Creek and even though Stoney Creek was not yet incorporated at the time that the lease was signed. We conclude that the Debtor remains liable as a "promoter" of Stoney Creek, thus rendering the confessed judgment against him valid and requiring us to overrule the Debtor's Objection.

Since the Debtor does not justify same on the record, the Confirmation Objections validly attack the Debtor's $350/month expenditure on life insurance under 11 U.S.C. § 1325(b)(1)(B). The merits of other Confirmation Objections, e.g., the Debtor's failure to include his wife's income or to realistically value his stock in his incorporated chiropractor business have been cured and appear to lack relevance, respectively.

### B. FACTUAL AND PROCEDURAL HISTORY

The Debtor commenced this case by filing an individual voluntary Chapter 7 bankruptcy petition on March 13, 1996. On March 27, 1996, the Debtor filed a motion to convert his case from Chapter 7 to Chapter 13, Chapter 13 Schedules, and the Plan. The conversion being of right pursuant to 11 U.S.C. § 706(a), see, e.g., In re Martin, 880 F.2d 857, 858–59 (5th Cir.1989); and 4 COLLIER ON BANKRUPTCY, ¶ 706.01, at 706–3 (15th ed. 1996), we granted the motion to convert ex parte on March 28, 1996, and appointed the Trustee to administer the case.

On the Debtor's original Schedules, he failed to include the income of his non-debtor spouse, with whom he and their four children reside, nor did he mention his medical practice, Wayne Chiropractic Health Center

("Wayne"). In his Schedules "I" and "J," respectively, the Debtor designated a monthly income of $3,920 and expenses of $3,770, including $350 for life insurance. Although the Debtor amended his Schedules in several minor respects prior thereto, he did not add mention of Wayne until a September 30, 1996, amendment to his Schedules, subsequent to Mozino's filing his Confirmation Objections raising, *inter alia,* this issue on September 23, 1996. In the amendment, he listed Wayne, as well as Stoney Creek, as stock holdings which were "not a profit center, nominal value only" valued at $1.00.

The Debtor's confirmation hearing was initially scheduled on October 17, 1996. Mozino's Confirmation Objections included reference to certain of the Debtor's expenses alleged to be not necessary for support of himself and his dependents, most notably his $350 life insurance expenditure; his failure to declare his interest in Wayne or indicate his income therefrom; his failure to recite his wife's income or expenses; and lack of good faith. On September 23, 1996, Mozino also filed an unsecured proof of claim in the amount of $17,840 based upon a confessed judgment entered against the Debtor, as well as Stoney Creek, in Mozino's favor on February 8, 1996, in the Delaware County, Pennsylvania Court of Common Pleas ("the C.C.P.").

In response to these filings, the Debtor, on September 26, 1996, filed the Debtor's Objection to the proof of claim filed by Mozino, challenging his individual liability to Mozino. The Debtor's Objection was scheduled for a hearing on November 12, 1996, and the confirmation hearing was ultimately continued to that date as well. On November 7, 1996, the Debtor also filed Adversary Proceeding No. 96–1228 ("the Proceeding"), naming Mozino and two of his attorneys, Joel Friedman, Esquire, and Richard H. Anderson, Esquire, as defendants. The Complaint asserted, *inter alia,* violations of the Debtor's civil rights, abuse of process, and malicious use of process in the filing of the C.C.P. action against him personally. A trial has been scheduled in the Proceeding on December 17, 1996, but the Debtor conceded that the failure to succeed in the Debtor's Objections, which has

transpired, would necessarily foreclose success in the Proceeding. We therefore anticipate that we will proceed to dismiss the Proceeding on the basis of this decision on its scheduled trial date.

After a consolidated hearing of November 12, 1996, on the Debtor's Objections and the Confirmation Objections, the latter of which were orally joined by the Trustee, we allowed the parties an opportunity to simultaneously file opening briefs in support of their respective positions with this court by December 3, 1996, and reply briefs by December 10, 1996. Mozino filed his opening brief early, on November 26, 1996. On November 27, 1996, the Debtor amended his Schedules "I" and "J" to add his wife's income and expenses, which increased the declared total monthly income from $3,920.00 to $4,144.86 per month, and his monthly expenses from $3,770.00 to $3,994.86 per month.

On December 3, 1996, the Debtor filed an emergency motion seeking a one-week extension of the briefing schedule due to illness. In light of the early submission of Mozino's brief, we allowed the Debtor until December 10, 1996, to file one brief, and allowed Mozino and the Trustee until December 13, 1996, by which to file reply briefs. Timely submissions were thereafter filed by the Debtor and Mozino, although the Trustee made no submission, despite our specific request that he do so.

The only witnesses at the hearing were the Debtor and Debbie Pappas, Mozino's property controller and manager. Most of the testimony concerned the circumstances of execution of a lease agreement ("the Lease") of January 11, 1995, whereby a property located at 501 Baltimore Pike, Springfield, Pennsylvania ("the Property"), was rented to Stoney Creek as a take-out bagel shop.

Prior to that date, Pappas gave the Debtor a proposal ("the Proposal") for the rental of the Property in question, dated December 9, 1994. One of the terms of the Proposal is that "[t]here shall be a personal guarantee given by the majority owner(s)/stockholder(s)" of Stoney Creek. The Debtor subsequently returned a signed copy of the Proposal to Pappas with a Commercial Rental Application ("the Application"), both of which

he dated December 28, 1994. The Application, filled out by the Debtor, recites the business name as Stoney Creek, but states that he himself is to be the "Name on Lease." Prior to execution of the Lease, Pappas performed a credit check of the Debtor individually and same was approved.

The Lease on the front page states that it is entered into between Mozino and "~~Scott B. Rothman T/A~~ [crossed out on original] Stoney Creek Bagels, Inc." On two signature lines on the last page of, and on six other places on the addendum to, the Lease, the Debtor signed two times, designating "Pres." after his name on one line and printing the word "Individual" after the other.

At trial, the Debtor testified that, after he had taken the Lease the day before its execution to review, his accountant advised him "not to have [his] name on the [L]ease personally." Thus, he requested of Pappas that the cross-out of his name be effected. Both he and Pappas testified that, after Pappas left the room to consult with her boss concerning this request, she did in fact cross off his name from the front page of the Lease and they both initialed the change. The Debtor explained that it was his intention, in having his name crossed off the Lease, to prevent himself from being held personally liable on the Lease by placing the Lease solely in the name of Stoney Creek. He further testified that he signed the Lease as an individual because Pappas told him that he could not lease the store unless he signed the Lease in that manner. Pappas herself testified that she informed the Debtor that he had to sign the Lease in his individual capacity and that he would be individually liable on the Lease, irrespective of his omission as a lessee. The Debtor did not testify that he informed Pappas of his intention to attempt to eliminate his individual liability or that she agreed to do so.

Although the Debtor initially testified that Stoney Creek was incorporated when the Lease was signed and it appeared that he may have indeed thought this to be the case, when confronted with official documents, the Debtor was compelled to concede that he signed the paperwork for the Articles of Incorporation for Stoney Creek on January 25, 1995, two weeks after the Lease was executed. Since he did not insert a specific effective date on the form, the date of incorporation of Stoney Creek is considered to be the date the articles were received and processed by the Pennsylvania Secretary of State, i.e., February 1, 1995. There is no indication that Pappas or anyone else involved with Mozino was aware of Stoney Creek's nonexistent status on January 11, 1995, and the evidence suggests that Pappas believed that Stoney Creek was incorporated when the Lease was signed.

Stoney Creek opened for business on March 1, 1995. Rent admittedly became delinquent and the Debtor did not and does not contest the amount of Mozino's claim. He was, however, disturbed that Mozino had given him no notice prior to locking him out of the Property on March 10, 1996, and of course he believes that only Stoney Creek should be liable on the rental obligation.

The Debtor testified very briefly about his $350 monthly life insurance payments. He stated only that the time of policy was "not term life" and that he "imagined" that the value went up each year. His Schedules indicated a $4,043 present value for a policy with New England Life Insurance Company ("New England") and $1,519 for a policy with Southland Home Life Insurance Company ("Southland"). In a post-trial Affidavit, the Debtor stated that the policies have death benefits of $195,164.20 (New England) and $250,000.00 (Southland), and makes the conclusory statement that they are not retirement vehicles or savings funds. The values of both policies are declared exempt under the elected state exemptions, based on 42 Pa.C.S. § 8124.

The Debtor testified that Wayne had assets and receivables which he valued at $1,000 and that, while he would not sell his stock in Wayne for as little as $17,000, he believed that the stock would be worthless without his participation in Wayne. We also note that the Plan calls for payments of $150 per month for 40 months, or total payments of $6,000 into the Plan. The Debtor's Schedules allege that all of his secured debts are current, but general unsecured creditors are to be paid *pro rata* after the payment of a

priority claim of the Internal Revenue Service, the amount of which is listed as "UNDETERMINED."

## C. DISCUSSION

1. The Debtor Is Personally Liable to Mozino Under the Lease, Requiring Rejection of His Objection to Mozino's Claim.

a. As the Debtor's Status at the Time of Signing the Lease was the Promoter for Stoney Creek, He is Liable on the Lease, Which Was Entered into Prior to the Formation of Stoney Creek.

The Debtor begins his arguments in support of his Objection with the principle of Pennsylvania Law that, if a contract is entered into in the name of a corporate agent, with the name of the corporation also being disclosed on the agreement, then there is a strong presumption that the intent of the contracting parties is that the principal should be the party to the contract, and not the agent. *See, e.g., Viso v. Werner*, 471 Pa. 42, 47, 369 A.2d 1185, 1187 (1977); and *Bucks v. Buckwalter*, 419 Pa. 544, 546, 215 A.2d 625, 627 (1966). Further, Pennsylvania law states that generally an agent will not be held liable for acts done on behalf of a "disclosed principal" and within the scope of the agent's authority. *Montgomery v. Levy*, 406 Pa. 547, 549, 177 A.2d 448, 450 (1962); and *Levy v. Conly*, 340 Pa. 332, 336, 17 A.2d 382, 383 (1941). Thus, Pennsylvania courts will not disregard the corporate entity in order to place liability on a corporate agent unless there is evidence of fraud or illegality on the agent's behalf which would warrant such treatment. *Viso, supra*, 471 Pa. at 49, 369 A.2d at 1188; *Tucker v. Binenstock*, 310 Pa. 254, 263, 165 A. 247, 250 (1933); and *McKenna v. Art Pearl Works, Inc.*, 225 Pa.Super. 362, 366, 310 A.2d 677, 679–80 (1973).

However, in this case, Mozino specifically sought to insure that the Debtor be personally liable under the Lease. The Proposal, the Application, and, finally, the recitation of the Debtor as lessee and the signature line for him to sign as an individual, all support this conclusion. This intention was or should have been perfectly clear to the Debtor prior to his signing the Lease. Consequently, the presumption is overcome. Here, the Debtor, knowing Mozino's intention, nevertheless voluntarily chose to enter into the Lease with Mozino.

The fact that Stoney Creek was not legally in existence at the time that the Lease was executed is very significant to a determination of the parties' rights.

In general, a corporation cannot acquire rights legal or equitable, or become charged with an obligation before the moment of its creation.... It comes into existence at a particular moment by the mere will of the sovereign, and has no previous life of any kind. Its rights are created and fixed by the charter, and it is against public policy to hamper its career with unknown liabilities, affecting the interest as well of stockholders as of the public who deal with it.

*Zalewski v. Pennsylvania Rabbit Breeders Cooperative*, 76 D. & C. 225, 227 (Adams Co. C.P. 1950). Thus, until articles of incorporation for a corporation have been filed with the Commonwealth, the corporation will be deemed to not yet be in existence, and thus lacking the capacity to enter into a contract, even if through an agent. *Id.* at 226.

A promoter is a person who assumes to act on behalf of a proposed corporation which is not yet incorporated. *Dintenfass v. Wirkman*, 14 D. & C. 798, 800 (Phila.Co.Munic.Ct.1930). In this case, since Stoney Creek was not yet formed at the time the Debtor entered into the Lease, his legal relationship to Stoney Creek is that of its promoter.

The general rule is that a promoter will be held personally liable on any contract that he makes for the benefit of a corporation which he intends to incorporate despite the fact that the promoter assumes that he is merely acting on behalf of the proposed corporation and not on his own behalf. *See RKO–Stanley Warner Theatres, Inc. v. Graziano*, 467 Pa. 220, 224, 355 A.2d 830, 832 (1976). *See also* Annot., *Personal Liability of Promoter to Third Person on or with Respect to Contract Made for Corporation or in Aid of Promotion*, 41 A.L.R.2d 477 (1955).

Furthermore, a promoter's personal liability continues after the formation of the proposed corporation and after the corporation has received the benefit of the contract unless the contract contains a novation or some other agreement to release the promoter from liability under the contract. *See RKO–Stanley, supra,* 467 Pa. at 224, 355 A.2d at 833; and *Dintenfass, supra,* 14 D. & C. at 799.

■ This imposition of personal liability upon a promoter when the promoter has entered into an agreement on behalf of the proposed corporation is based upon the principle that one who acts on behalf of a nonexistent corporation is himself personally liable on the contract unless there is an agreement to the contrary. *RKO–Stanley, supra,* 467 Pa. at 224, 355 A.2d at 833. However, despite the fact that a promoter entered into the contract on behalf of a proposed corporation, if the "person with whom the contract is made agrees to look to the corporation alone for responsibility, the promoter incurs no personal liability with respect to the contract." *RKO–Stanley, supra,* 467 Pa. at 224, 355 A.2d at 833. In this case Mozino never agreed to look to Stoney Creek alone for payment on the Lease. In fact, Pappas insisted that the Debtor sign the Lease in his individual capacity, and made it clear throughout the negotiation process and, if Pappas is to be believed, as we feel that she is, through the execution of the Lease, that it intended to hold the Debtor personally responsible under the Lease.

In *O'Rorke v. Geary,* 207 Pa. 240, 242, 56 A. 541, 542 (1903), the court thusly noted three possible interpretations of the relationship between a promoter and another party when they execute an agreement and the promoter is acting on behalf of a proposed corporation:

> When a party is acting for a proposed corporation, he cannot of course, bind it by anything he does, at the time, but he may (1) take on its behalf an offer from the other which, being accepted after the formation of the company becomes a contract; (2) make a contract at the time binding himself, with the stipulation or understanding, that if a company is formed it will take

his place and that then he shall be relieved of responsibility; or (3) bind himself personally without more and look to the proposed company, when formed, for indemnity.

*See also Surovcik v. D & K Optical, Inc.,* 702 F.Supp. 1171, 1179 (M.D.Pa.1988); *In re Collins Hosiery Mills, Inc.,* 19 F.Supp. 500, 502 (E.D.Pa.1937); and *RKO–Stanley, supra,* 467 Pa. at 225, 355 A.2d at 833.

■ Finally, it is a well settled principle that a contract which is executed by a corporation's promoter is not binding upon the corporation, even if the contract was entered into for and in the name of the proposed corporation, unless the corporation subsequently adopts the contract, either expressly or impliedly. *See RKO–Stanley, supra,* 467 Pa. at 226–27, 355 A.2d at 834; and *Zalewski, supra,* 76 D. & C. at 227. A corporation is not automatically bound by an agreement entered into by its promoter once the corporation comes into existence, but rather has the option of accepting, or rejecting, the benefit of the contract. *Bonner v. Travelers Hotel Co.,* 276 Pa. 492, 496, 120 A. 467, 468 (1923); and *Zalewski, supra,* 76 D. & C. at 228.

■ More important to the instant dispute, if there is no express language in the particular contract regarding the parties' intention to release the promoter from personal liability upon the contract, or to provide for a substitution of responsibility by the corporation, the courts will not impute this intention to them. *RKO–Stanley, supra,* 467 Pa. at 227, 355 A.2d at 834; *Strauss & Co. v. Berman,* 297 Pa. 432, 436, 147 A. 85, 86 (1929); and *O'Rorke, supra,* 207 Pa. at 244, 56 A. at 542. "Corporations necessarily act through agents and if one acting is to escape personal liability for what he intends to be a corporate obligation, the limitation of his responsibility should be made to appear on the face of the instrument. Otherwise, an individual signature of a promoter imports personal liability: ..." him. *Watters v. DeMilio,* 390 Pa. 155, 159, 134 A.2d 671, 674 (1957). *See also Strauss, supra,* 297 Pa. at 435, 147 A. at 86; and *Flexlume Corp. v. Norris,* 98 Pa.Super. 530, 533–34 (1930). The fact that the promoter or promoters is/are the same

person or persons who signed the corporation's articles of incorporation as its incorporators is irrelevant. *Zalewski, supra,* 76 D. & C. at 228. Prior to incorporation, a promoter can only bind himself. *Id.*

At the same time, however, if after the corporation is incorporated, it accepts the benefit of the contract in question, the corporation "will be required to perform its obligation." *Zalewski, supra,* 76 D. & C. at 227, citing *Beltz v. Garrison,* 254 Pa. 145, 152, 98 A. 956, 958 (1916). The relevant inquiry is not whether the contract benefitted the corporation, but rather whether the corporation accepted the benefits of the contract. *Zalewski, supra,* 76 D. & C. at 228. "Its liability must be predicated upon the fact that it accepted that which it would be unjust for it to retain without making payment therefor.... To establish liability it is necessary to point to some affirmative act on its part, after its incorporation, which constituted an acceptance of the benefits of the contract." *Id.*

The facts of *Dintenfass* are quite similar to those of the instant case, in that there the promoter of an insurance company entered into a commercial lease to rent office space. When the lease was signed, the insurance company was not yet incorporated. The promoter informed the lessor of this fact prior to entering into the lease. The parties agreed that the promoter was acting as an agent for the insurance company, which was to occupy the leased premises and which was going to make the rental payments. The leased premises were occupied solely by the insurance company. 14 D. & C. at 799.

Subsequent to its incorporation the insurance company did make the rental payments and occupy the premises, with the lessor's knowledge and consent. The lessor ultimately sued the promoter for breach of the lease for assigning the lease to the corporation, contrary to the lease provisions. *Id.* The court opined that "[t]he fact that the corporation was subsequently formed and accepted the benefits of the lease does not of itself effect a release of the lessee named in the lease, unless there is a novation or an assumption by the corporation, with the consent of the landlord, of the promoter's liabili-

ty under the lease." *Id.* at 800. The court further stated that, "[o]f course, promoters of a corporation are personally liable on contracts which they have entered into personally, even though they have contracted for the benefit of the projected corporation and although the corporation has been formed and has received the benefit of the contract; and they are not discharged from liability from the subsequent adoption of the contract when formed, unless there is a novation or other agreement to such affect." *Id.* Since there was no evidence that the insurance company accepted the lease or assumed the promoter's liability under the lease, the court held that the promoter and not the insurance company was liable under the Lease. *Id.*

In this case the Debtor, as its sole incorporator, incorporated Stoney Creek on February 1, 1995. The Lease was entered into prior to that time, on January 11, 1995. Consequently, the Lease may not be binding upon Stoney Creek despite the fact that it was entered into for and in the name of the Stoney Creek, since there is no evidence that this corporation ever subsequently adopted the contract, either expressly or impliedly. No written agreement was entered into between Debtor and Stoney Creek by which Stoney Creek agreed to adopt the Lease as its own obligation, the Lease does not contain a provision by which Mozino agreed to look to Stoney Creek alone for payment under the Lease, and the Debtor signed the Lease in his individual capacity.

However, even if it was Debtor's intention to only sign the Lease on behalf of Stoney Creek alone, Pennsylvania decisional law still holds that a promoter is personally liable on contracts entered into by him prior to the incorporation of a corporation unless the contract specifically states that only the corporation is responsible under the contract or unless the corporation agrees to be bound by the contract. There was no evidence presented that Stoney Creek ever intended to be so bound.

This case is therefore weaker in its facts to support the Debtor's avoidance of liability than those in *Dintenfass.* Mozino, per Pappas, did not know that Stoney Creek was not

incorporated at the time that the Lease was entered and hence never agreed to look to Stoney Creek alone at some later time. Accordingly, under clear principles of controlling Pennsylvania law, the Debtor, as the promoter of Stoney Creek, must be held personally liable on the Lease despite the fact that he assumed that he was merely acting on behalf of Stoney Creek, his proposed corporation, and not on his own behalf.

b. The Debtor's Unilateral Mistake Regarding His Personal Obligation to Mozino Under the Lease Does not Affect That Obligation.

Although the foregoing discussion identifies one basis on which the Debtor must be found personally liable to Mozino, irrespective of the parties' intention to modify his liabilities, we must also observe that there is no support for the Debtor's alternative argument that the parties intended to modify that liability.

The Debtor argues that the key question with regard to whether he is personally liable under the Lease is whether he understood that he would be held personally liable in light of the excision of his name as a lessee on the Lease. It must be emphasized that the only change which the Debtor requested to the Lease by Pappas was the striking of his name as a lessee. The Debtor does not contend that he informed Pappas that he believed that this action would eliminate his personal liability. Pappas, on the other hand, testified, without rebuttal, that she specifically informed the Debtor that Mozino intended to look to him to be personally liable and responsible under the Lease even if his name were stricken as a lessee. The Proposal, executed by the Debtor on December 28, 1994, specifically states that the owner or majority stockholder of Stoney Creek, i.e., the Debtor, must give a personal guaranty under the Lease. In addition, the Application that the Debtor identified himself as the sole prospective lessee. In signing the Lease, the Debtor executed the Lease in his own handwriting and its addendum seven times as an "Individual."

The Debtor argues several general principles of contract law in his defense, which,

while correct, do not control in this factual setting. He correctly observes that, under Pennsylvania law, leases are controlled by principles of contract law. *Warren v. Greenfield,* 407 Pa.Super. 600, 606, 595 A.2d 1308, 1311 (1991); and *Pugh v. Holmes,* 486 Pa. 272, 295, 405 A.2d 897, 908 (1979). He notes that, in order for a valid contract to exist, there must be mutuality of assent, *i.e.,* a "meeting of the minds," between the parties to the contract. *See Essner v. Shoemaker,* 393 Pa. 422, 425, 143 A.2d 364, 366 (1958); and *Rusiski v. Pribonic,* 326 Pa.Super. 545, 551, 474 A.2d 624, 627 (1984), *rev'd on other grounds,* 511 Pa. 383, 515 A.2d 507 (1986).

Thus, where there is mutual mistake by both parties as to an essential term or fact, as opposed to the unilateral mistake of one party, which term or fact induced the mistaken person to enter into the contract, the contract can be voided or modified when the parties discover the mistake. *See In re CS Associates,* 121 B.R. 942, 952 (Bankr. E.D.Pa.1990); *Vrabel v. Scholler,* 369 Pa. 235, 239, 85 A.2d 858, 860 (1952); *Gocek v. Gocek,* 417 Pa.Super. 406, 410, 612 A.2d 1004, 1006 (1992); *Sanders v. Lawn Mutual Ins. Co.,* 194 Pa.Super. 491, 494, 168 A.2d 758, 760 (1961); and *Ehrenzeller v. Chubb,* 171 Pa.Super. 460, 463, 90 A.2d 286, 287 (1952). On the other hand, when the asserted mistake is unilateral rather than mutual, is due to the negligence of the mistaken party, and is not due to the fault of the non-mistaken party, Pennsylvania law will not permit relief to be granted to the mistaken party. *See CS Associates, supra,* 121 B.R. at 952; *Warren, supra,* 407 Pa.Super. at 609, 595 A.2d at 1312; *Cobaugh v. Klick–Lewis, Inc.,* 385 Pa.Super. 587, 561 A.2d 1248, 1251 (1989); *Rusiski, supra,* 326 Pa.Super. at 552, 474 A.2d at 627; *McFadden v. American Oil Co.,* 215 Pa.Super. 44, 53–54, 257 A.2d 283, 288 (1969); *Seaboard Radio Broadcasting Corp. v. Yassky,* 176 Pa.Super. 453, 459, 107 A.2d 618, 620 (1954); and *Appel Media, Inc. v. Clarion State College,* 15 Pa.Cmwlth. 635, 639–40, 327 A.2d 420, 423 (1974).

The Debtor also observes that, when there is a unilateral mistake by one party and fraud by the other party to a contract, the mistaken party can obtain relief

in a court of law. *McFadden, supra,* 215 Pa.Super. at 54, 257 A.2d at 289, citing *Cook v. Liston,* 192 Pa. 19, 21, 43 A. 389, 390 (1899). Furthermore, even if there is no actual fraud perpetuated by a party to a contract, if that party knows or should know of the other party's unilateral mistake with regard to the terms of the contract, a court may grant relief to the mistaken party to the same extent as if there had been a mutual mistake. *Id.,* citing *Cook, supra; Commonwealth, Dep't of Educ. v. Miller,* 78 Pa. Cmwlth. 1, 3, 466 A.2d 791, 792 (1983); and *Appel, supra,* 15 Pa.Cmwlth. at 639–40, 327 A.2d at 423. Thus, the subjective intent of a party to a contract is relevant to making a determination as to whether there has been unilateral or mutual mistake only if the other party to the contract knows or has reason to know of the intention of the mistaken party. *Ingrassia Construction Co. v. Walsh,* 337 Pa.Super. 58, 66, 486 A.2d 478, 483 (1984).

For example, in *Appel, supra,* a business contracted with Clarion College to install visual media equipment at the school. Unbeknownst to the contractor, there was an existing problem with the electrical grounding at the college, which was likely to affect its ability to timely complete its contract. Certain personnel employed by the college were fully aware of the grounding problem, but did not inform the contractor about it. A clause in the contract that was signed by the parties stated: "The CONTRACTOR assumes full responsibility for having familiarized himself with the nature and extent of the ... local conditions that may in any manner affect the Work to be done." 15 Pa.Cmwlth. at 640, 327 A.2d at 423. The court held that, since no evidence was presented showing that college personnel knew or should have known that the contractor was unaware of the grounding problem, the circumstances could not be equated to one in which mutual mistake occurred. *Id.* Thus, the contract was not voidable because the contractor was alone at fault for its unilateral mistake. *Id.*

■ The facts of this case indicate that, if there was a mistake, it was a unilateral mistake on the part of the Debtor alone. We find that Mozino, per Pappas, always intended to hold the Debtor personally liable under the Lease, as is evident from the Proposal and the Application, and it never wavered from this position through the time that the Lease was actually signed on January 11, 1995, nor thereafter. The Debtor assumed, whether rightly or wrongly, that, by crossing off his name as a lessee on the Lease, he was relieving himself of his personal liability thereon.

■ We next consider the issue of whether Mozino fraudulently induced Debtor to sign the Lease, or, in the alternative, knew or should have known of the Debtor's mistaken interpretation of the contract. There is no evidence of a fraud being perpetuated on the Debtor by Mozino. The Debtor approached Mozino for the purpose of obtaining a Lease on the Property in which he would be the lessee. The Debtor, without informing Pappas of his intentions, attempted, on the advice of his accountant, to eliminate his personal liability by having Pappas excise his name as a lessee. In doing so, he never expressed this intention to Pappas. On the other hand, Pappas clearly expressed Mozino's continuing intention to hold the Debtor personally liable on the Lease obligations during the negotiations. If any party was trying to perpetuate a fraud on the other, it could be more forcefully argued that the Debtor was attempting to do so to Mozino than vice versa. He apparently believed, per the advice from his accountant, that striking his name as a lessee would protect him, irrespective of not only his signing the Lease as an individual, but also irrespective of the contrary belief of Pappas.

At this point, we must observe that the advice of the accountant to the Debtor, at least as interpreted by the Debtor, regarding the potential effect of striking his name as a lessee was mistaken. He appears to believe that, if he were not a lessee, he generally could not be held personally liable on the Lease. Such is rather clearly not the law. Third parties, particularly principals of a corporate lessee, are frequently called upon to guarantee obligations for their corporations. We are in no sense prepared to find that such guarantees are unenforceable, particularly where the principal is quite clearly in-

formed of the necessity of his supportive personal delegation.

A strong case in point is *Denlinger, Inc. v. Dendler*, 415 Pa.Super. 164, 608 A.2d 1061 (1992). In that case the principal of a construction company executed a credit application form in which his corporation was the applicant. 415 Pa.Super. at 170, 608 A.2d at 1064. The principal signed the name of the corporation to the contract, by himself as "Pres." 415 Pa.Super. at 170–71, 608 A.2d at 1064. He did *not*, as did the Debtor here, sign the contract again, or in any other manner as an individual. However, the pre-printed contract form presented by the creditor included a clause stating that, if it were signed by an individual on behalf of a corporation, the individual would be declared to be personally guaranteeing the obligation. 415 Pa.Super. at 171, 608 A.2d at 1065.

The principal argued vociferously that he was unaware of the contract release, it had never been brought to his attention, he had no intention of providing a personal guaranty, and the contract clause so providing was an adhesion contract which was unenforceable against him. 415 Pa.Super. at 171–72, 608 A.2d at 1066. These defenses were brushed aside with the following statements, 415 Pa.Super. at 180, 180–81, 608 A.2d at 1069, 1070:

> Dendler "was legally bound to know the terms of the contract in which he himself engaged." *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962). Moreover, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains. (citations omitted) *Ignorantia non excusat.*" *Simeone v. Simeone*, 525 Pa. 392, 400, 581 A.2d 162, 165 (1990) (emphasis in original).

. . . . .

Our Supreme Court has stated:

> "A person of age is presumed to know the meaning of words in a contract, and *if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain* that he was not acquainted with its contents and *did not understand the meaning of the words* used in the instrument which he signed. (citations omitted) (emphasis added)."

*Schoble v. Schoble*, 349 Pa. 408, 411–412, 37 A.2d 604, 605 (1944). "It is well established that one having the capacity to understand a written document ... who signs it, is bound by his signature." 13 Williston on Contracts, § 1577 (3rd ed. 1970). Moreover, "[where a signer] has *made himself acquainted with the words of the document and his mistake concerns its interpretation or legal effect*, his unilateral error affords no more grounds for relief than does ignorance of the words." *Id.* (emphasis added).

As Mozino argues in its reply brief, there was no reason for Pappas to implicitly assume, in light of the Debtor's nondisclosure of his reasons for so requesting, that the Debtor's purpose in striking his name was to attempt to avoid personal liability on the Lease. As Mozino suggests in his reply brief, the striking of the Debtor's name could have been intended to merely affect his possible tort liability or product liability to third persons or tax liability to name Stoney Creek as the sole lessee. Thus, there is no legal basis for an assumption that the Debtor's intention to exclude himself as a co-lessee was intended to eliminate his personal liability on the Lease.

Upon review of the foregoing authorities, we observe that we were speaking loosely at the hearing in suggesting that the contract terms, insofar as whether the Debtor was individually bound under the Lease or not, were ambiguous. The foregoing careful review of the record and the applicable law causes us to more appropriately assess the contractual terms as clearly binding the Debtor as a contracting promoter of Stoney Creek or as a guarantor. We therefore decline to traverse the path suggested by the Debtor in his brief of construing a potentially ambiguous contract against the party who drafted it.

When a contract, as here, is not legally ambiguous, but rather is clear and unequivocal, the court determines the mean-

ing of the contract terms by looking only at the words of the contract and does not consider the surrounding circumstances. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 539, 526 A.2d 1192, 1194, *appeal denied*, 517 Pa. 607, 536 A.2d 1331 (1987). Moreover, parties to a contract will be bound by the agreement, "without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable and good bargains." *Simeone v. Simeone*, 525 Pa. 392, 400, 581 A.2d 162, 165 (1990). *See also In re St. Mary Hospital*, 101 B.R. 451, 461 (Bankr. E.D.Pa.1989); *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983); *Estate of Brant*, 463 Pa. 230, 233, 344 A.2d 806, 809 (1975); *Bollinger v. Central Pennsylvania Quarry Stripping Construction Co.*, 425 Pa. 430, 432, 229 A.2d 741, 742 (1967); and *Montgomery, supra*, 406 Pa. at 550, 177 A.2d at 450. Thus, contractual terms will be held to be binding upon the signers thereof without regard to whether they fully understand the terms of the contract. *Simeone, supra*, 525 Pa. at 400, 581 A.2d at 166.

Consequently, we hold that the Debtor herein is bound by the Lease and is personally liable on the Lease. This is true despite the fact he mistakenly thought that, by crossing off his name as a lessee on the first page of the document, he would no longer be held personally liable on it, particularly since he then proceeded to sign his name seven times in both his individual capacity as well as in his capacity as President of Stoney Creek. The various signings, if nothing else, should have alerted him to the difference in signing his name in his corporate and individual capacities.

Furthermore, the Debtor herein, while appearing to act on behalf of Stoney Creek when he signed the Lease, was not so acting at that point because Stoney Creek was not yet an existing corporation. For this reason also, and particularly when the two legal bases for liability submitted by Mozino are considered, the Debtor must be deemed personally liable on the Lease. Furthermore, in light of the Debtor's concession that this resolution of this issue precludes any attack on the confessed judgment entered against him personally, that judgment may stand despite its apparent constitutional infirmities, as pointed out by this court in *In re Road Patch Services, Inc.*, 154 B.R. 869, 872–73 (Bankr.E.D.Pa.1993).

2. **The Debtor's Chapter 13 Plan Cannot be Confirmed, Principally Because It Provides for Life Insurance Premium Payments Which Are Not a Necessary Expense of the Debtor.**

 Having determined that the Debtor's Objection to Mozino's claim must be overruled and that Mozino's claim must remain intact, we must now consider the Confirmation Objections raised by Mozino and joined by the Trustee. Initially, the Debtor alleged, in an Answer to Mozino's Confirmation Objections, that Mozino is not a creditor in the bankruptcy proceeding and thus has no standing to object to the Plan. To the extent that the Debtor bases this argument on Mozino's standing in his role as an executor of an estate, the law of Pennsylvania is clear that the executor of an estate can maintain a lawsuit or raise claims of a decedent in his or her representative capacity. *Baffa v. Black*, 481 F.Supp. 1083, 1086 (E.D.Pa.1979). As the "holder of an allowed secured claim," Mozino clearly has standing to raise an objection to confirmation pursuant to 11 U.S.C. §§ 1325(b)(1)(B), (b)(2), which reads as follows:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is

received by the debtor and which is not reasonably necessary to be expended—

> (A) for the maintenance or support of the debtor or a dependent of the debtor; and

> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

There are two general means of applying the foregoing so-called "disposable income test." The majority of courts believe that the disposable income test requires a court to determine whether a debt is reasonably necessary for the support and/or maintenance of the debtor and the debtor's dependents. *In re Humphrey,* 165 B.R. 508, 510 (Bankr. M.D.Fla.1994); and *In re Jones,* 55 B.R. 462, 466 (Bankr.D.Minn.1985). The minority holds that, if a debtor uses all of his or her disposable income to fund the Chapter 13 plan of reorganization, then § 1325(b)(1)(B) is satisfied and the appropriateness of the debt should be assessed pursuant to the good faith standard of 11 U.S.C. § 1325(a)(3). *Humphrey, supra,* 165 B.R. at 510; and *In re Jones,* 119 B.R. 996, 1002 (Bankr.N.D.Ind. 1990).

■ In the past this court has implicitly followed the majority view in *In re Crompton,* 73 B.R. 800, 808 (Bankr.E.D.Pa.1987), *accord, In re Navarro,* 83 B.R. 348, 355–56 (Bankr.E.D.Pa.1988); and *In re Fries,* 68 B.R. 676, 682–85 (Bankr.E.D.Pa.1986) (both per FOX, J.), relegating the good faith issue to the narrow issue of the Debtor's honesty and full disclosure of pertinent facts. *See In re Lilley,* 201 B.R. 725, 728–29 (Bankr. E.D.Pa.1996), quoting *In re Gathright,* 67 B.R. 384, 387–88 (Bankr.E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987). We continue to do so herein.

■ We also note that, in consideration of a § 1325(b)(1)(B) objection, the creditor or trustee bears the initial burden of proving that the debtor's plan of reorganization does not contemplate the application of all of his or her disposable income to the plan over the life of the plan. *See Navarro, supra,* 83 B.R. at 355; *Crompton, supra,* 73 B.R. at 808–09; and *Fries, supra,* 68 B.R. at 685. *See gener-*

*ally In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa.1990). However, after the creditor satisfies the initial burden, the ultimate burden of proof shifts to the debtor. *Crompton, supra,* 73 B.R. at 809; and *Fries, supra,* 68 B.R. at 685. *See generally Fricker, supra,* 116 B.R. at 437–38 (the party with most access to proof and seeking to change the status quo, usually the debtor as plan proponent, has the ultimate burden of proof on most confirmation issues).

■ In this case, Mozino satisfied its initial burden by raising specific questions regarding certain aspects of the Debtor's Plan, most notably the issue of whether he has committed all of his disposable income to the Plan. The Debtor therefore has the burden of proving that these Objections lack merit and that his Plan is nevertheless confirmable.

The Bankruptcy Code does not define the terms "reasonably necessary living expenses," requiring us to look to decisional law for guidance. Most courts that have pondered this term have determined that a bankruptcy court is required to take into account a debtor's income and exempt property, both present and future, in determining the appropriate amount of money which must be set aside for the debtor to be able to sustain his and his dependents' basic needs which are not related to his "former status in society or the lifestyle to which he is accustomed." *In re Gillead,* 171 B.R. 886, 890 (Bankr.E.D.Cal.1994); *In re Cardillo,* 170 B.R. 490, 491 (Bankr.D.N.H.1994); *In re Schnabel,* 153 B.R. 809, 817 (Bankr.N.D.Ill. 1993); *Navarro, supra,* 83 B.R. at 354–55; *In re Sutliff,* 79 B.R. 151, 157 (Bankr. N.D.N.Y.1987); *In re Kitson,* 65 B.R. 615, 619–20 (Bankr.E.D.N.C.1986); *Jones, supra,* 55 B.R. at 466; and *In re Taff,* 10 B.R. 101, 107 (Bankr.D.Conn.1981).

Applying section 1325(b)(1)(B) to facts similar to those at hand, the court in *In re Smith,* 187 B.R. 678, 679 (Bankr.D.Idaho 1995), concluded that the debtor's monthly payment of a $300 life insurance premium was not a "reasonably necessary living expense." The court determined that the life insurance premium was not reasonably necessary for the support or maintenance of the debtors or a dependent of the debtors and

that the life insurance policies in issue were in substance a means by which the debtor contributed some of his present income to the future income of the beneficiary of the life insurance policy. *Id.* Thus, the *Smith* court held that, absent a showing by the debtor that he was required by law to maintain the life insurance policy, the life insurance premium was not a necessary expense. *Id. See also In re Cornelius,* 195 B.R. 831, 835 (Bankr.N.D.N.Y.1995) (court cited cases stating, and debtor conceded, that voluntary contributions to bank accounts and retirement and pension plans must be considered to be disposable income); *In re Moore,* 188 B.R. 671, 675 (Bankr.D.Idaho 1995) (debtors' § 401K contributions and loan repayments were not necessary expenses, thus the payments were disposable income); *In re Cavanaugh,* 175 B.R. 369, 373 (Bankr.D.Idaho 1994) (debtor's voluntary contributions to § 401K retirement accounts were not reasonably necessary, and therefore the § 401K contributions were considered to be disposable income); *In re Scott,* 142 B.R. 126, 134, 135 (Bankr.E.D.Va.1992) (debtor's voluntary contributions to his ERISA plan were not reasonably necessary for his maintenance and support); *In re Fountain,* 142 B.R. 135, 137 (Bankr.E.D.Va.1992) (since the debtor's creditors would not be paid in full under her chapter 13 plan, her voluntary payments to a pension plan during the life of her chapter 13 plan were not necessary for her support and maintenance, and therefore they constituted disposable income); *In re Ward,* 129 B.R. 664, 668 (Bankr.W.D.Okla.1991) (voluntary deductions from debtor's paycheck for a savings account were not necessary expenses and were thus disposable income); *In re Colon Vazquez,* 111 B.R. 19, 20 (Bankr.D.Puerto Rico 1990) (since Puerto Rico law required that a payroll deduction be made from a teacher's pay in order to establish a savings account, the deducted amount was not disposable income); and *In re Festner,* 54 B.R. 532, 533 (Bankr.E.D.N.C.1985) (voluntary contribution to retirement plan was not an expense necessary for debtor's maintenance and support). Similarly, in the only other case addressing the reasonability of expenditures of life insurance at length, *In re Vianese,* 192 B.R. 61 (Bankr.N.D.N.Y.

1996), the United States Trustee's motion to dismiss the debtor's chapter 7 case for substantial abuse under 11 U.S.C. § 707(b) was granted because the court found that life insurance premium payments of $250 per month were excessive. *Id.* at 72.

The Debtor argues in his brief that the expenditure of $350 per month in life insurance premiums is not luxurious nor excessive, and that courts should not impose their value judgments on debtors in determining whether their plans of reorganization meet the requirements of 11 U.S.C. § 1325(b)(1)(B). He also cites to several cases which, without discussing this issue, do not "seem to object" to allegedly-comparable life insurance payments proposed by debtors, *e.g., In re Campbell,* 198 B.R. 467, 469 (Bankr.D.S.C.1996) ($69.34 monthly premiums noted without comment in a case under 11 U.S.C. § 523(a)(15)); *In re Nolan,* 140 B.R. 797, 799, 803 (Bankr.D.Colo.1992) (court comments that unquantified payment of life insurance component of $800 monthly support and medical and life insurance payments are excessive only insofar as they include life insurance on the debtor's children); *In re Roth,* 108 B.R. 78, 80 (Bankr.W.D.Pa.1989) (court does not disapprove of monthly "automobile and life insurance" payment of $261); and *Fries, supra,* 68 B.R. at 683 n. 8 (additional evidence was required to justify a $235 monthly "life/property liability insurance" payment).

While we agree that generally we should not impose questionable value judgments on a debtor in determining whether expenses meets the requirements of 11 U.S.C. § 1325(b)(1)(B), we agree with Judge Fox, as he stated in *Navarro, supra,* 83 B.R. at 355–56, that we are obliged to exercise our judgment in assuming a debtor's expenditures when one of five factors is present:

a. the debtor proposes to use income for luxury goods or services;

b. the debtor proposes to commit a clearly excessive amount to non-luxury goods or services;

c. the debtor proposes to retain a clearly excessive amount of income for discretionary purposes;

d. the debtor proposes expenditures which would not be made but for a desire to avoid payments to unsecured creditors;

e. the debtor's proposed expenditures as a whole appear to be deliberately inflated and unreasonable.

Per this analysis, we find that factor number two applies, *i.e.*, the "debtor proposes to commit a clearly excessive amount to non-luxury goods or services."

The Debtor proposes to continue making payments of $350 per month in life insurance premiums as a "necessary expense." No testimony was presented regarding the "savings component" of the Debtor's life insurance policy. The Debtor's attempt to suggest that the savings component is secondary to the Debtor's purpose for maintaining these policies by an inconclusive post-trial Affidavit attached to his brief is clearly inappropriate. *See, e.g., In re Blanchard,* 201 B.R. 108, 114 n. 1 (Bankr.E.D.Pa.1996); and *In re Lease–A–Fleet, Inc.,* 131 B.R. 945, 951–52 (Bankr.E.D.Pa.1991), *aff'd in part & rev'd in part on other grounds,* 141 B.R. 63 (E.D.Pa.), aff'd, 983 F.2d 1051 (3d Cir.1992).

■ We conclude that the fact that the Debtor pays $350 monthly for the life insurance premiums, or $4,200 per year, indicates an inordinate and unnecessary amount spent for such a purpose. In so holding, we note that we do not object to a debtor's expending a reasonable amount on life insurance. We are not certain that there is not a savings component to the Debtor's insurance policies, but we find the amount paid to be excessive irrespective of the presence of any savings component. The amount of the insurance payments compares most unfavorably with the Plan's provision of only $1,800 per year towards payments to be allocated to the Debtor's unsecured creditors. The real amount payable to such creditors is, moreover, uncertain because the Debtor's federal income tax liability has not been determined.

We also find that the amount to be paid for life insurance is so greatly in excess of that which appears reasonable under the pertinent case authority that we are unwilling to discount the deficiency payable to creditors as a permissible "cushion." *Compare*

*Crompton, supra,* 73 B.R. at 803–04, 808–09 ("cushion" of $97.63 monthly was tolerated in the context of debtor's sparse budget of $800 monthly expenses for debtor and two dependent children). The debtor's monthly expenses are roughly three times that of the *Crompton* debtor.

The decisions in the *Smith, supra;* and *Vianese, supra,* are persuasive authority that the Debtor's proposed life insurance premium payments are excessive. None of the cases cited by the Debtor approve any payment approaching $350 monthly for life insurance alone. *Smith* and *Vianese* disapproved payments of $300 and $250 monthly, respectively. The Debtor proposes to spend even more. Concluding that the proposed life insurance payments are not reasonably necessary for the Debtor's or his dependents' support and maintenance, nor is the premium payment mandated under Pennsylvania law, we will sustain the Confirmation Objections on this basis.

■ We will briefly discuss some of the other issues raised by Mozino in the Confirmation Objections in order to provide some guidance to the Debtor in formulating the requisite amended plan necessary to achieve confirmation in light of our present rulings. We agree with the courts which have held that a non-debtor spouse's income and expenses must be taken into account when determining whether a debtor's disposable income meets the requirements of § 1325(b)(1)(B). *See In re Carter,* Bankr. No. 95–19069DWS (Bankr.E.D.Pa. August 20, 1996) (SIGMUND, J.); *In re Pickering,* 195 B.R. 759, 767 (Bankr.D.Mont.1996); *Cardillo, supra,* 170 B.R. at 492; *Schnabel, supra,* 153 B.R. at 818; *In re Belt,* 106 B.R. 553, 561–63 (Bankr.N.D.Ind.1989); *In re Carbajal,* 73 B.R. 446, 447 (Bankr.S.D.Fla. 1987); *In re Saunders,* 60 B.R. 187, 188 (Bankr.N.D.Ohio 1986); *In re Kern,* 40 B.R. 26, 28–29 (Bankr.S.D.N.Y.1984); *In re Sellers,* 33 B.R. 854, 857 (Bankr.D.Colo.1983); *In re Kull,* 12 B.R. 654, 659 (Bankr.S.D.Ga. 1981), *aff'd sub nom. In re Kitchens,* 702 F.2d 885 (11th Cir.1983). *But cf. In re Harmon,* 118 B.R. 68, 69 (Bankr.E.D.Mich.1990) (since non-debtor spouse was not joined in

bankruptcy case, bankruptcy court had no jurisdiction over her, her assets, or her income, and thus her income would not be considered in determining whether debtor's expenses were reasonable and necessary).

While Mozino's objection on this score would have constituted another sustainable Confirmation Objection to the Plan as proposed, we note that the Debtor has since amended his Schedules to reflect the amount of his wife's monthly income and expenses. While of course such amendments are not part of the record and could be discounted by us in ruling on the Confirmation Objections before us, we are now past the point of needing to determine whether the Confirmation Objections can be sustained. They must be sustained on other grounds, and the only remaining pertinent issue is whether the amendments to add the wife's income will give rise to other objections in light of the anticipated amended plan to be proposed by the Debtor.

Mozino also objected to the Debtor's valuation of his stock in Wayne at $1.00, in light of his testimony that Wayne had assets worth at least $1,000 and that he would not sell the stock for $17,000. We note that the presence of several cases holding that the value of a debtor's stock in his professional corporation must be measured in contexts where the status of the debtor's post-petition earnings as property of his estate, *In re FitzSimmons*, 725 F.2d 1208 (9th Cir.1984), or the distribution of proceeds from the sale of the business, *In re Prince*, 85 F.3d 314 (7th Cir.) *cert. denied sub nom. Prince v. Unsecured Creditors Committee*, —— U.S. ——, 117 S.Ct. 608, —— L.Ed.2d —— (1996), were in issue. However, where disclosure of the accurate value of his professional practice in the debtor's schedules was raised solely as an 11 U.S.C. § 727(a)(4)(A) issue in *In re Freedman*, 1994 WL 455030, at *4 (Bankr.E.D.Pa. Aug. 19, 1994), *aff'd*, 1995 WL 118217 (E.D.Pa. March 9, 1995), we noted that we "have not typically observed that professionals who intend to continue in practice have included such an item as an asset."

It is unclear to us how Mozino attaches any practical significance to the Debtor's alleged failure to accurately disclose the value of Wayne's stock in the context of this case. It is too late to assert an objection to the Debtor's claimed exemption of the stock on this basis. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 643–45, 112 S.Ct. 1644, 1648–49, 118 L.Ed.2d 280 (1992); and Federal Rule of Bankruptcy Procedure 4003(b).

The only possible significance that we can perceive is the assertion that, in light of these misleading disclosures, the Plan is not confirmable under the good faith requirement of 11 U.S.C. § 1325(a)(3), which Code section Mozino does raise in a generalized way, because the Debtor has not honestly provided a full and complete disclosure of his assets, as required by *Lilley, supra*, 201 B.R. at 728–29; and *Gathright, supra*, 67 B.R. at 387–88. While we are indeed somewhat troubled by the Debtor's casual attitude towards this issue, *i.e.*, valuing his stock in Wayne as the same value as his stock in Stoney Creek, which is out of business, and would have strongly preferred a more thorough disclosure of the nature and value of the Wayne stock in the Schedules, we are unwilling to attribute such great significance to a lapse in a matter of at best tangential relevance to administration of the Debtor's case as to sustain a § 1325(a)(3) objection solely on this basis.

## D. CONCLUSION

We will therefore enter an Order overruling the Debtor's Objection to Mozino's claim and sustaining the Confirmation Objections in part. The further consequence of the former is a likely dismissal of the Proceeding, although we will await the hearing to render this disposition. The further consequence of the latter is a requirement that the Debtor promptly prepare an amended plan consistent with this Opinion, to which further objections can be raised and we will caution that the failure to accomplish confirmation of which will ultimately result in dismissal of this case.

## ORDER

AND NOW, this 17th day of December, 1996, after a hearing of November 12, 1996, in reference to the Objection of the Debtor ("the Debtor's Objection") to the claim of the

Estate of Andrew L. Mozino ("Mozino") and the Objections of Mozino and the Trustee to confirmation ("the Confirmation Objections") of the Debtor's Chapter 13 Plan ("the Plan"), it is hereby ORDERED AND DECREED as follows:

1. The Debtor's Objection is OVER-RULED. Mozino's general unsecured claim in the amount of $17,840 against the Debtor will stand as filed.

2. The Confirmation Objections raised under 11 U.S.C. § 1325(b)(1)(B) are SUS-TAINED. Confirmation of the Plan is DE-NIED.

3. The Debtor shall resolve all outstanding impediments to Confirmation, including those identified in the foregoing Opinion, by filing and serving an Amended Plan consistent with that Opinion as well as making any other filings necessary to achieve confirmation on or before January 3, 1997, or this case may be dismissed.

4. A further hearing to consider confirmation and dismissal of this case is scheduled on

THURSDAY, JANUARY 30, 1997, AT 9:30 A.M. and shall be held in Courtroom No. 4 (Room 3718), United States Court house, 601 Market Street, Philadelphia, PA 19106.

5. No continuances of the foregoing hearing will be favored, and this case may be dismissed on January 30, 1997, if a plan cannot be confirmed on that date.